THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE S. THOMPSON, Defendant-Appellant.

Second District   No. 2—83—0406

Opinion filed July 12, 1984.

666

Peter B. Nolte, and Sreenan & Cain, P.C., both of Rockford, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

George Scott Thompson, defendant, was convicted by a jury in the circuit court of Winnebago County of the offense of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2), and sentenced by the trial court to six years in the Department of Corrections. On appeal, he raises these issues: (1) whether the information charging armed robbery was fatally defective for failing to allege one of the mental states of intent, knowledge, recklessness, or negligence; (2) whether

refusal of an instruction defining the defense of intoxication denied defendant a fair trial; (3) whether the refusal of an instruction defining the term "dangerous weapon" denied the defendant a fair trial; (4) whether the court erred in excluding the testimony of the defendant's expert witness at trial; and (5) whether the court erred in denying defendant's motion to suppress the defendant's post-arrest statements.

The defendant was convicted on accountability principles of the armed robbery of a clerk at a Stop-N-Go store in the city of Rockford.

Lenora White, the clerk at the Stop-N-Go, testified that on December 7, 1981, at approximately 7:30 p.m., two young men came into the store. They were later identified during trial as Robert Lighthart and Paul Higgs. She said they looked at some adult magazines, bought a bag of potato chips and left the store. Shortly afterward, Lighthart returned with another larger young man who had not been in the store before. He was identified during trial as the defendant. Lighthart pointed a gun at White and told her to give him all of the money which she had in her hand and in the cash register. She testified the defendant did not say or do anything, but merely stood behind Lighthart. Lighthart and the defendant then left the store.

A nearby resident, Wesley Larson, testified that he observed the defendant and Lighthart running out of the store, getting into an automobile, and leaving. He wrote down the license plate number, took it to the Stop-N-Go store, and the police were notified. The license plate number was broadcast over the police radio, and Rockford police officer Getty observed a car with the license number of the suspect vehicle parked in the parking lot of the One-Stop Pharmacy on Auburn Street. Officer Getty radioed for back-up, while observing three white males exit the pharmacy and enter the car, which was already occupied by one individual. When back-up officers arrived, the occupants of the car were taken into custody. The defendant, who was in the driver's seat of the car, stated in response to a question that the car was his. The car was searched on the scene, and a .177-caliber pellet gun was found under the front seat of the car on the passenger side. The defendant was searched and $52.25 was found in his pocket. The defendant was brought to the police station, where he was interviewed by Detective Randall Oldenburger. The defendant refused to sign the rights waiver, but agreed to talk to the detective. After relating his version of events to the detective, Oldenburger testified he had the defendant repeat his story while he typed it verbatim.

The statement was admitted during trial. In the statement, the defendant relates that he, Bob Lighthart, Paul Higgs, and Terry Bahl-

ing were driving around during the afternoon drinking beer. During that time they talked about armed robbery, and the defendant produced a pellet gun which he had in the car. Lighthart said that he would try a robbery with the gun, because none of the rest of the group had the guts. In defendant's statement, he admits that he and Lighthart went in the store, and that Lighthart had the gun. He took it out of the waistband of his pants, told the lady to hang up the phone, and said: "Give us all the money in the cash register." They took the money and returned to the car and went driving around. They went to the One-Stop Pharmacy to get cigarettes, at which time the police arrested them.

At trial, the defendant stated that some of the things in his statement were not precisely the things that he told Detective Oldenburger, but that he could really not remember all of what he told him that night because he was so intoxicated. The defendant's testimony at trial essentially was that early on the morning of December 7, Terry Bahling came over to his house and from there called Robert Lighthart and Paul Higgs and asked them to come over. The four of them then drove to the Central Park Tap and purchased a case of beer. They proceeded to the defendant's brother's house where they drank beer and played games until approximately 3:30 in the afternoon. During that time, between noon and 3 p.m., the defendant testified he drank about 12 cans of beer. The four men left the defendant's brother's at approximately 3:30 and went to the Central Park Tap to purchase another case of beer. They then drove around drinking the beer for some time.

Lighthart told the defendant to pull the car over in an area near the Stop-N-Go store on North Main Street. Lighthart said he wanted to do a robbery, and the other three occupants in the car wanted no part of it. Lighthart and Higgs then went into the Stop-N-Go, and defendant and Bahling stayed in the car. About 10 minutes later, Lighthart and Higgs returned, and the four of them sat in the car for about another 20 minutes. Lighthart began calling the defendant names and accusing him of being a "chicken," and told the defendant that he did not have to do anything in the store except walk in. Defendant walked with Lighthart toward the store, but stopped and said he had changed his mind and was not going in. After Lighthart began calling him more names, he proceeded to follow Lighthart into the store and stood behind Lighthart while he pointed a gun at the cashier and told her to give him all the money. Defendant testified he did not say anything or threaten the cashier in any way, and that he was drunk and scared to death at the time. The defendant testified

the pellet gun was not operable because there were no pellets in it, and the carbon dioxide cartridge which provided the propellant for the pellets had been empty for a year, and that the inner barrel was not in place and that without it, it could not be fired. Defendant also testified that although it was a pellet gun, he had previously used it only to shoot BB's.

■ The defendant argues the information was fatally defective for failing to include one of the mental states as required by section 4—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 4—3). The amended information charged:

"That on the 7th day of December, 1981, in the County of Winnebago and State of Illinois, GEORGE S. THOMPSON committed the offense of Armed Robbery, in that he, by threatening the imminent use of force or by the use of force and while carrying on or about his person a dangerous weapon, to-wit: a certain gun, took certain United States currency from the person or presence of Lenora J. White ***."

The original information, which was dismissed, had included the phrase: "[in that he] knowingly and intentionally, [by threatening, etc.]." When the amended information was filed, defendant orally moved to dismiss the information for failure to include a mental state. That motion was denied. His subsequent motion on the same ground for directed verdict at the end of the State's case and at the close of all the evidence was denied, as were his motions in arrest of judgment and for a new trial.

Defendant acknowledges neither the robbery nor armed robbery statute contains any language specifically requiring that the defendant act with a certain mental state. (Ill. Rev. Stat. 1983, ch. 38, pars. 18—1, 18—2.) Nevertheless, in the absence of any indication of a legislative purpose to impose absolute liability (see Ill. Rev. Stat. 1983, ch. 38, par. 4—9), he contends one of the mental states described in sections 4—4 through 4—7 must be alleged or the charge is legally insufficient under section 111—3 and cannot withstand a motion to dismiss. Ill. Rev. Stat. 1983, ch. 38, par. 111—3.

In support, he cites *People v. Leach* (1972), 3 Ill. App. 3d 389, a case in which the court *inter alia* held an information charging mob action (Ill. Rev. Stat. 1983, ch. 38, par. 25—1), a general intent crime, was fatally defective for failing to allege one of the mental states in sections 4—4 through 4—7. A later case involving the same mob action issue, *People v. Grant* (1981), 101 Ill. App. 3d 43, which relied on *Leach*, is also cited in support here.

The State asserts defendant's claim in this regard is refuted by

the supreme court's decision in *People v. Banks* (1979), 75 Ill. 2d 383, and an earlier case, *People v. Hayes* (1972), 52 Ill. 2d 170. The State acknowledges the issue addressed in *Banks* was whether the indictment was deficient for failure to include the allegation that the defendant intended to permanently deprive the victim of the use or benefit of the property. Nevertheless, it asserts that issue is so closely related to the issue of the mental state at bar that *Banks* should be considered dispositive. The State additionally argues the *Hayes* case considered the precise issue here, and determined lack of the allegation that the defendant committed the offense with intent or knowledge was not fatal, since the words of the armed robbery statute so far particularize the offense that, by use of the statutory words alone, an accused is apprised with reasonable certainty of the precise offense with which he is charged.

The defendant replies that *Banks* should be narrowly construed as dispositive only with regard to the allegation concerning an accused's intent to permanently deprive the victims of the use or benefit of their property. He distinguishes *Hayes*, correctly so, on the basis the court there was reviewing the insufficiency of the information under the standard applied when the complaint is attacked for the first time on appeal. That is, the complaint is sufficient if it apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to a future prosecution arising out of the same conduct. (*People v. Gilmore* (1976), 63 Ill. 2d 23, 29.) However, when the complaint is attacked either by pretrial motion or in a motion in arrest of judgment, the complaint must meet the stringent requirements of section 111—3 of the Code of Criminal Procedure of 1963. *People v. Gilmore* (1976), 63 Ill. 2d 23, 29; see also *People v. Miller* (1983), 116 Ill. App. 3d 361, 367-68.

The defendant's argument fails to establish the court below erred on the basis he asserts. We note that the mental state of negligence as defined in section 4—7 has no application here, because neither the armed robbery nor robbery statute describes a particular mental state. In such cases, section 4—3(b) provides any mental state defined in sections 4—4, 4—5, or 4—6 is applicable. Section 4—7 notably has been omitted from the realm of possible mental states.

Defendant's argument fails to give effect to the plain language of the statutes at issue here: section 4—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 4—3) and section 111—3 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1983, ch. 38, par. 111—3.) In pertinent part, section 4—3 provides:

"(a) A person *is not guilty* of an offense, \*\*\* unless, \*\*\* he acts while having one of the mental states described in Sections 4—4 through 4—7." (Emphasis added.)

Defendant's argument superimposes the above requirement on the provision of section 111—3 which, in pertinent part, is that:

"(a) A charge shall be in writing and allege the commission of an offense by:

\* \* \*

(3) Setting forth the nature and elements of the offense charged; \*\*\*."

Defendant then views the resulting product as a hybrid which requires that one of the mental states described in sections 4—4 through 4—6 must be alleged in the charging instrument, otherwise it is fatally defective.

Section 111—3 has been construed to mean, however, that a charge is sufficient to withstand a motion to dismiss or a motion in arrest of judgment if the indictment or information sufficiently states the necessary elements of the offense so that by the language used the defendant is apprised with reasonable certainty of the precise offenses of which he is charged. (*People v. Miles* (1981), 96 Ill. App. 3d 721.) The purpose of the requirements of section 111—3, drawn pursuant to due process principles, is to make certain that the accused will be adequately informed of the nature and elements of the offense charged against him so that he may be able to prepare his defense and protect himself from double jeopardy by subsequent prosecutions for the same offense. (*People v. Graves* (1982), 107 Ill. App. 3d 449.) When the defendant properly raises the issue of the sufficiency of the information in the trial court, as here, the information must be scrutinized to determine whether it conforms to the statutory requirements of section 111—3. (*People v. Hockaday* (1982), 93 Ill. 2d 279, 281.) Specifically, then, the issue here is whether the information sets forth the nature and elements of the offense.

The elements of the offense of robbery are deprivation of a person's property, in his presence, through force or intimidation. (*People v. McCarty* (1981), 101 Ill. App. 3d 355, *aff'd in part and rev'd in part on other grounds* (1983), 94 Ill. 2d 28, 33.) Armed robbery is the commission of robbery with the addition of the element "while 'armed with a dangerous weapon.' " 94 Ill. 2d 28, 33.

Neither the robbery nor the armed robbery statute sets forth a specific intent element, and the supreme court in *People v. Banks* (1979), 75 Ill. 2d 383, overruling its previous decision in *People v. White* (1977), 67 Ill. 2d 107, reaffirmed what it considered was a mat-

ter of legislative prerogative as construed by a line of prior Illinois cases, to-wit: that robbery is a general intent crime.

In *Banks*, the court noted the Committee Comments to section 18—1 (robbery) unquestionably state there is no requirement of a specific intent:

> " 'This section codifies the law in Illinois on robbery and retains the same penalty. No change is intended. *** No intent element is stated as the taking by force or threat of force is the gist of the offense and no intent need be charged. (See *People v. Emerling*, 341 Ill. 424, 173 N.E. 474 (1930).)' " *People v. Banks* (1979), 75 Ill. 2d 383, 391-92.

Although defendant seeks to distinguish *Banks* on the basis that that case dealt with the intent to permanently deprive a victim of the use or benefit of his property, he does not here suggest exactly what other intent he believes should have been charged. Section 4—3 has been construed to mean that *if* the statutory definition of an offense includes a mental state with which the act is committed as an element of the offense, that knowledge or mental state must be alleged in the indictment charging such offense. (*People v. Mager* (1976), 35 Ill. App. 3d 306, 308; *People v. Edge* (1950), 406 Ill. 490, 493.) No intent or mental state is included in the definition of the offense of robbery or armed robbery. When no particular mental state is applicable, as here, the State's burden for showing a *mens rea* may be satisfied by showing that the defendant acted with any of the mental states in sections 4—4 through 4—7. (*People v. McMullen* (1980), 91 Ill. App. 3d 184, 190.) The defendant here has not challenged the sufficiency of the proof, and the issue presented here must be determined in the procedural context in which it was presented to the court below and which the defendant argues here; that is, by way of a motion to dismiss and in arrest of judgment. As previously noted, in order to withstand a motion to dismiss the charging instrument must comply with the stringent requirements of section 111—3. This court in *People v. Whelan* (1971), 132 Ill. App. 2d 2, found that an indictment for armed robbery was not insufficient for failing to charge any mental state. The defendant there had contended the indictment was insufficient under section 111—3 because no intent or knowledge was charged. The *Whelan* court relied on *People v. Emerling* (1930), 341 Ill. 424, and *People v. Johnson* (1931), 343 Ill. 273. Those cases were revitalized as a result of the supreme court's decision in *People v. Banks*. In addition to holding that robbery is a general intent crime, the information in *Banks* was also found to be sufficient to state the offense of robbery. The count charging robbery in the indictment had been chal-

lenged in a motion to dismiss on the intent issue and had been granted by the circuit court. The supreme court reversed and remanded, however, and, citing *People v. Beck* (1976), 42 Ill. App. 3d 923, found that it would be "contrary to reason and experience" to assume that the indictment was insufficient to inform the defendant of the precise charge against him, or "that the intent to deprive a person of his or her property could not be inferred from the language employed." (*People v. Banks* (1979), 75 Ill. 2d 383, 393.) The indictment in *Banks* was for robbery and the language employed was: " 'in that [the defendants] did take property, being two (2) rings from the person or presence of Zilphia Lauderdale, by the use of force' on August 11, 1975." (75 Ill. 2d 383, 386.) The language employed here, save for the specific difference in facts and the inclusion of the "armed with a dangerous weapon" element, was as sufficient as that in *Banks*. Here, it would also be contrary to reason and experience to find the information at bar was insufficient to allow the defendant to prepare a defense to the charge or to plead a judgment as a bar to a future prosecution for the same offense.

We distinguish *People v. Leach* (1972), 3 Ill. App. 3d 389, cited by the defendant, along with the case which relied on *Leach, People v. Grant* (1981), 101 Ill. App. 3d 43, primarily on the basis of their facts, since *Leach* did not involve armed robbery and, secondarily, on the basis that in *Leach* it is not clear the sufficiency of the complaint was analyzed strictly on the basis of section 111—3; that is, what must be charged, as opposed to whether one may be guilty of an offense as provided in section 4—3. Beyond that, the language of the complaint in *Leach* was not so particularized as that at bar so as to allow inference of the defendant's intent there. The complaint did not specify how the defendant in that case " 'did by the use of force and violence disturb the public peace \*\*\*.' " (*People v. Leach* (1972), 3 Ill. App. 3d 389, 392.) Here, the defendant's active intent to deprive another person of her property is readily inferable from the language of the information.

We conclude the information properly stated an offense, and the court did not err in denying the defendant's motions to dismiss and in arrest of judgment.

■ Defendant next asserts he was denied a fair trial due to certain errors in instructions. He first notes that the court, although conceding at the post-trial motion hearing that the defense of intoxication would have been available to him since he was "charged with armed robbery by accountability," nevertheless the court determined that he had failed to prove his defense of intoxication and, therefore, refused

to give the instruction.

Defendant argues he need only have presented slight evidence of an affirmative defense in order to be entitled to a jury instruction on that theory of his defense. (*People v. Bratcher* (1976), 63 Ill. 2d 534; *People v. Helm* (1973), 9 Ill. App. 3d 143; *People v. Wallace* (1981), 100 Ill. App. 3d 424.) He notes the State admitted in its post-trial memo that "it is clear the defendant presented some evidence of intoxication." Defendant asserts it was improper for the court to weigh the evidence presented, since the only issue before the court was whether the defendant had presented "some evidence" of intoxication.

The State argues first the defendant has waived this issue by failing to renew his request for the intoxication instruction after he had adduced the evidence he claims supported the giving of the instruction. (*People v. Underwood* (1978), 72 Ill. 2d 124.) The instruction conference here was held after the State rested, and before the defendant had presented his case. Alternatively, the State argues the court was correct in determining that the evidence failed to show that the defendant was so intoxicated as to render him incapable of any mental action, "such as forming the specific intent to commit the crime," and that the instruction was therefore not warranted.

The issue was not waived by the defendant's failure to renew his request for the instruction, and *People v. Underwood*, cited by the State, does not support a finding of waiver here. The record clearly shows the court initially refused the instruction, not because of any deficiency in the quantum of evidence, but because it believed as a matter of law that the defense of voluntary intoxication was not available to a defendant charged with a general intent crime such as armed robbery. On that point, the court was correct. See *People v. Rosas* (1981), 102 Ill. App. 3d 113; *People v. Brumfield* (1979), 72 Ill. App. 3d 107; *People v. Baker* (1979), 72 Ill. App. 3d 682.

At the post-trial hearing, however, the court apparently accepted the defendant's argument that the fact the defendant was convicted of the armed robbery on the basis of accountability, which requires a finding of specific intent (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c)), "with the intent to promote or facilitate such commission [of the offense], ***"; thus, the defense of voluntary intoxication was available to him, and the jury should have been instructed as to that offense. Although the court acknowledged that accountability is not an offense, but merely an alternative to the nature of proof required to convict (see *People v. Buffington* (1977), 51 Ill. App. 3d 899), it nevertheless found that because it required specific intent, the defense of

voluntary intoxication was available to the defendant to negate the intent element of accountability. Despite that, the court determined that the evidence did not show the defendant was so intoxicated as to have negatived the specific intent. Consequently, the court denied the defendant's motion for a new trial.

█ We will, as the parties have, assume *arguendo* that the court's finding was correct that the defense of voluntary intoxication would have been available to the defendant in order to negate the specific intent required in order to sustain the conviction for armed robbery under accountability principles. In determining whether a trial court abused its discretion in deciding a motion for a new trial, the reviewing court will consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 549.) The court's decision will not be disturbed unless a manifest abuse of discretion can be shown. *People v. Smith* (1978), 59 Ill. App. 3d 480.

█ Based on our review of the record, we conclude no abuse of the court's discretion is evident, and the defendant was not denied a fair trial. The court below observed that although the defendant testified he was drunk, he nevertheless was able to testify with clarity and in detail about the events before, during, and after the armed robbery. The court noted the defendant's testimony that Lighthart called him names, "a chicken," and so forth, because he did not want to participate in the robbery, and that the defendant testified that he "got mad" and proceeded to go into the store after Lighthart. Later, the defendant testified Lighthart gave him money from the robbery.

█ █ The defendant's argument that he need only have presented slight evidence of his intoxication is relevant for purposes of determining whether the burden of proof shifted to the State. (Ill. Rev. Stat. 1983, ch. 38, par. 3—2.) " 'Slight evidence' " will justify an instruction on a given defense (*People v. Chatman* (1982), 110 Ill. App. 3d 19, 22), and the defendant is entitled to instruction on any defense shown by the evidence; the court may not weigh the evidence in making a determination as to whether an instruction on the defense is warranted. (*People v. Bryson* (1980), 85 Ill. App. 3d 448; *People v. Boisvert* (1975), 27 Ill. App. 3d 35.) However, in order to negate specific intent, the defendant's intoxication must have been so extreme that it entirely suspended his power of reason; there is no " 'diminished capacity' " defense. (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 927.) Merely being drunk or intoxicated is insufficient to create a defense of intoxication. (*People v. Moon* (1982), 107 Ill. App. 3d

568.) Where the evidence on the record indicates that the defendant acted with any purpose or rationality or remembered the offense with clarity or detail, voluntary intoxication is not an available defense. (*People v. Nichols* (1981), 96 Ill. App. 3d 354.) Errors in giving or refusing of instructions do not always justify reversal where the evidence of a defendant's guilt is so clear and convincing that a jury could not reasonably have found the defendant not guilty. *People v. Jones* (1979), 81 Ill. 2d 1.

■ Assuming, *arguendo*, it was not error for the court to have concluded that the defense was available as a matter of law, the evidence nevertheless fails to show the defendant's intoxication was so extreme as to have negated the specific intent required to sustain his conviction under accountability principles, and the jury could not reasonably have found him not guilty even if it had been instructed as to the intoxication defense.

We conclude the court did not abuse its discretion in denying defendant's motion for a new trial, nor was he denied a fair trial.

■ Next, we consider the "dangerous weapon" instruction. The defendant tendered, and the court refused, these instructions:

"A dangerous weapon is a weapon that is likely to cause death or great bodily harm to another person.

\* \* \*

An object or an instrument which is not inherently dangerous may be a dangerous weapon depending on the manner of its use and the circumstances of the case. IPI Crim. 2d 4.17.

\* \* \*

An object or an instrument which appears to be inherently dangerous may not be a dangerous weapon depending on the manner of its use and the circumstances of the case.

\* \* \*

An object or an instrument which is not inherently dangerous may be a dangerous weapon depending on the manner of its use and the circumstances of the case.

An object or an instrument which appears to be inherently dangerous may not be a dangerous weapon depending on the manner of its use and the circumstances of the case."

Defendant argues it was reversible error for the court to have refused his instructions because they were correct statements of the law, and because the jury was left to speculate as to whether or not the weapon used here—an inoperable unloaded .177-caliber pellet gun— was a dangerous weapon. Defendant's position below was that the weapon was not dangerous, in view of its inoperability, and in or-

der for it to have been considered a dangerous weapon it would have to have been shown either that Lighthart actually used or threatened to use the weapon as a bludgeon or club, or was in such a position as to have been able to use the gun in that manner at the time he demanded the money from the victim of the armed robbery.

The defendant's argument here is untenable. In *People v. Skelton* (1980), 83 Ill. 2d 58, the authority for Illinois Pattern Jury Instruction (IPI), Criminal, No. 4.17 (2d ed. 1981), set forth above, it was stated:

> "Most, if not all, unloaded real guns and many toy guns, because of their size and weight, could be used in deadly fashion as bludgeons. Since the robbery victim could be quite badly hurt or even killed by such weapons if used in that fashion, it seems to us they can properly be classified as dangerous weapons although they were not in fact used in that manner during the commission of the particular offense. It suffices that the *potential* for such use is present; the victim need not provoke its actual use in such manner." (Emphasis added.) *People v. Skelton* (1980), 83 Ill. 2d 58, 66.

Consequently, it is the weapon's potential for inflicting deadly or serious harm which is at issue, and not whether the weapon was, in fact, used or threatened to be used in a dangerous, deadly fashion, such as in the nature of a bludgeon.

Whether a weapon is dangerous is generally a question of fact to be decided by the trier of fact, here, the jury. However, where the character of the weapon is such as to admit of only one conclusion, the question becomes one of law for the court. (83 Ill. 2d 58, 66.) The weapon here was a .177-caliber pellet gun. During closing argument, defense counsel stated:

> "I certainly agree that an object of this weight and size if used as a club or a bludgeon is a deadly or a dangerous weapon if it's used that way."

Despite the fact the weapon in question has not been submitted for examination to this court, it was produced at trial and was viewed by the jury. Since *Skelton* holds it is the object's potential for deadly use rather than the actual use as such (an objective test), which qualifies it for classification as a dangerous weapon, it is clear from the evidence, as well as counsel's comments during closing argument, that the pellet gun here was such a weapon, even though there was evidence that it was unloaded and inoperable since it was missing a carbon dioxide cartridge. Other cases have also found pellet guns could be dangerous weapons due to their potential use as bludgeons. *People v. Martinico* (1981), 101 Ill. App. 3d 250; *People v. Greer* (1977), 53

Ill. App. 3d 675.

The court here expressed its belief during the instruction conference that the instructions tendered by the defendant did not accurately reflect the law, and indicated that it would instruct the jury on the question if an instruction were drafted which properly reflected the law. The defendant failed to follow up on the court's invitation. Although the court's duty to make certain the jury is instructed on the elements of the offense is well established (see *People v. Parks* (1976), 65 Ill. 2d 132), all errors in jury instructions do not require reversal. As noted by the State, both it and the defendant extensively argued their theories as to whether the pellet gun here could be considered a dangerous weapon. Defense counsel apparently acquiesced in this irregular procedure rather than tendering a further instruction or instructions which would have met with the court's approval.

Given the clear state of the evidence as to the character of the weapon, including in no small part defense counsel's comments during closing argument, we do not see how the jury could have found the weapon not dangerous under the *Skelton* test. Consequently, we conclude the instructional error may be deemed harmless, and no reversal is warranted. *People v. Jones* (1979), 81 Ill. 2d 1; *cf. People v. Ogunsola* (1981), 87 Ill. 2d 216, 223 (where the court found it could not conclude that a properly instructed jury might not have acquitted the defendant).

The defendant next argues it was error for the court to have excluded, by granting the State's pretrial motion *in limine*, the testimony of Doctor Frank Cushing. The doctor testified for the defendant at the motion to suppress hearing, and the defendant asked that that testimony be considered his offer of proof at trial. He contends here the doctor's testimony was relevant as showing the circumstances surrounding the defendant's confession, thus going to its credibility, and would also have been relevant to his intoxication defense.

The State correctly asserts the defendant should be deemed to have waived the issue of the admission of the evidence insofar as it may have been relevant to the credibility of his confession, since the defendant offered the evidence at trial in support of his intoxication defense, not as being relevant to the credibility of his confession. It is well established that a different theory of admissibility than that which was offered at trial below may not be argued on appeal. (*People v. Miller* (1977), 55 Ill. App. 3d 136; *People v. Walker* (1974), 22 Ill. App. 3d 711, 715-16.) Additionally, as the State points out, the defendant at trial did not attempt to establish that his statement was given involuntarily, only that the statement which was admitted contained

inaccuracies in that it did not reflect what the defendant told Detective Oldenburger. Oldenburger was called on rebuttal at trial, and testified that he typed the statement as the defendant told it to him, line by line.

The circumstances of the instant case distinguish it from the case cited by the defendant in support of his contention, *People v. Scott* (1963), 28 Ill. 2d 131. In that case, the defendant tried repeatedly to present evidence to the jury that he signed the confession which was admitted in evidence as a result of offers from the police that the case would be dropped or he would receive probation if he would agree to sign the statement in order to clear up the case. All of defendant's efforts to present this evidence to the jury were unsuccessful. The supreme court reversed and remanded the cause for a new trial, since it found that even though a confession has been admitted in evidence, the defendant still has a right to present evidence which affects the credibility or weight to be given the confession by the jury. In the case at bar, the State's motion *in limine* sought to preclude the doctor's testimony on the basis the crime of armed robbery was a general intent crime, and that the defense of voluntary intoxication is available only where the offense charged is a specific intent crime. Apparently the defendant did not dispute that the evidence was being offered for that purpose, since he did not argue any other theory of admissibility of the evidence, and the court granted the State's motion *in limine*. Consequently, the defendant may not now argue the doctor's testimony should have been admitted on the basis that it would be relevant to the credibility of the defendant's confession.

Further, no prejudice to the defendant is seen as the result of the court's ruling excluding the testimony, in view of the fact the defendant testified at the suppression hearing that he knew he had the right to remain silent, yet he talked with Detective Oldenburger, and did not point out any errors in the statement which he made to the detective, after it was reduced to writing and after he himself read and signed it.

The defendant argues secondarily that the doctor's testimony concerning the defendant's mental processes when intoxicated and the fact that he "is a follower who could be easily persuaded and might not fully understand the consequences of his actions at all times" was relevant to the defense in this case. At argument on the motion *in limine*, however, defense counsel stated Doctor Cushing would "be testifying to George's [the defendant] very limited mental capacity and his borderline retarded abilities to comprehend either verbal or written communications." Testimony as to either of those topics

would not have established a legal defense to the charge of armed robbery, and defendant cites no authority in support of his argument that Doctor Cushing's testimony would have been relevant to his defense.

We conclude the exclusion at trial of Doctor Cushing's proffered testimony was not error.

■■ Defendant's last contention is that the court erred in denying his motion to suppress his post-arrest statement. He asserts that the court's conclusion he knowingly and voluntarily waived his fifth amendment rights was against the manifest weight of the evidence, and must be reversed. He characterizes the evidence at the suppression hearing as having presented the court "with a 19-year-old man, with extremely low intelligence, a border-line retardate, who could not assimilate or understand words read to him and who had been drinking all day when questioned by an experienced police detective at 11 p.m., two-and-one-half hours after his arrest; a young man who testified that he did not understand the import of the rights waiver read to him." Defendant asserts that in light of defendant's low IQ (84) and his auditory processing deficit as testified to by Doctor Cushing, it is "certainly probably true" that he did not understand the rights read to him. As the State points out, the defendant's low intelligence by itself is insufficient to establish one's lack of ability to understand or waive *Miranda* rights. (See, *e.g., People v. Gonzales* (1974), 22 Ill. App. 3d 83, 86; *People v. Hentz* (1979), 75 Ill. App. 3d 526; *People v. Hester* (1968), 39 Ill. 2d 489, 500.) The State asserts more than enough evidence was adduced by the State to sustain its burden of proof.

The trial court need not be satisfied beyond a reasonable doubt that the waiver was voluntary (*People v. Raitano* (1980), 81 Ill. App. 3d 373); it is sufficient if voluntariness is shown by a preponderance of the evidence. (*People v. Sizemore* (1981), 97 Ill. App. 3d 1088; *People v. Cozzi* (1981), 93 Ill. App. 3d 94.) Further, the trial court's determination that there has been a voluntary waiver of rights is not to be disturbed unless it is against the manifest weight of the evidence. *People v. Marek* (1980), 92 Ill. App. 3d 746.

Detective Oldenburger testified at the suppression hearing about the warning procedure he followed. He asked the defendant to read the first line of the written waiver form (which defendant denies occurred), then read the succeeding paragraphs to the defendant, receiving after each paragraph defendant's affirmative response that he understood what the detective had just read to him. Although the defendant refused to sign the written waiver form, he agreed to talk

to the detective. Testimony conflicted as to whether his refusal to sign the waiver form was because his mother told him not to sign *anything* (detective's testimony), or because she told him not to sign *anything he did not understand* (defendant's testimony). The defendant admitted on cross-examination that he knew that he had the right to remain silent. Although he testified later at trial that the statement he signed was incorrect because it did not reflect precisely what he told the detective, he admitted he had read the statement, had signed it, and had not told the detective that certain parts of it were wrong.

■■■ At a hearing to suppress a confession, it is the trial court's responsibility to determine credibility of witnesses, and the competency of the confession and the trial court's decision will not be reversed unless it is contrary to the manifest weight of the evidence. (*People v. Lewis* (1979), 75 Ill. App. 3d 259.) In determining the voluntariness of the confession, the trial court was entitled to consider the totality of the circumstances. (*People v. Underwood* (1982), 108 Ill. App. 3d 846.) The defendant here has failed to show that the court's determination was against the manifest weight of the evidence, and we conclude no reversal is warranted.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

HOPF and LINDBERG, JJ., concur.