**UNITED STATES of America ex rel.
Robert Jefferey BURNS, Petitioner,**

v.

**J. Ronald HAWS, Respondent.**

No. 88 C 8975.

United States District Court,
N.D. Illinois, E.D.

July 11, 1989.

Robert Jefferey Burns, Centralia, Ill., pro se.

Terence Madsen, Asst. Atty. Gen. Crim. Appeals Div., Chicago, Ill., for respondent.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Early in the morning of October 28, 1982, the doorbell awoke Arthur and Barbara Carlsten from their sleep in their Schaumburg, Illinois, condominium. Arthur "buzzed" the callers into the building, and opened his door to see who they were. They were two men. The Carlstens recognized one of them as Robert Jefferey Burns, who was a friend of the Carlstens'

son. The other man, whom the Carlstens had never met before, was Richard Jones.

Burns asked the Carlstens if their son was home. Barbara muttered that it was a bad time for a visit, and returned to bed. Burns then told Arthur that Burns's car had stalled nearby, and asked if he could use the telephone. Arthur assented, and let the men in. Burns and Jones went to use the telephone in the kitchen. Arthur meanwhile went to his room to put on more clothes. He returned to the living room and encountered Burns, who had emerged from the kitchen. Arthur offered to give Burns and Jones a ride home, but Burns declined. Burns indicated that their calls were not successful, and that he and Jones would probably have to try calling again, perhaps from a nearby convenience store. Arthur then asked if Burns and Jones wished to leave through the front door or through a back door, which was in the kitchen. Burns said that the back would be better, and so Arthur and Burns went to the kitchen.

Burns went to the back door and started removing a burglar bar installed on it. At that moment Jones grabbed Arthur from behind, and slashed Arthur's throat from below his ear to beneath his collar line. Jones followed this slash with stabs into Arthur's cheeks and elsewhere. As Arthur struggled to ward off Jones's attacks, he pleaded with Burns, "Jeff, why are you letting this happen?" Burns, who was standing three to four feet away watching the melee, only stared in silence.

During this time Barbara was still in bed. She heard a knock on her bedroom door, and Burns opened it. Burns told Barbara that she should go to the kitchen. As she was putting on her robe, she heard Arthur scream for her. She ran into the living room and saw Burns, who gestured her to the kitchen. Barbara looked in, and saw cabinets torn off the wall, broken cabinet doors, a broken chandelier, and strewn glass. Jones had his back to her, and Barbara rushed up behind him and grabbed hold. Jones spun around and stabbed her in the left side of her face. A bleeding Arthur attempted to strike Jones with a chair, but Jones avoided the blow. As Jones and Arthur struggled, Barbara franticly phoned for help. As she was phoning she noticed Burns, who was standing in the doorway smiling. Jones and Burns hurriedly left the kitchen and the Carlstens' condominium as Barbara finally contacted the operator.

Shortly thereafter, Schaumburg police picked up Burns as he was making a call from a public telephone. Later that day detectives arrested Jones. Over two years later, a Cook County, Illinois jury found both men guilty of attempted murder, home invasion, three counts of armed violence, and four counts of aggravated battery. The trial judge sentenced Jones to serve concurrent 30–year terms for the attempted murder and home invasion charges, and a five-year concurrent term for aggravated battery. The judge vacated the other judgments against Jones. Burns for his part received concurrent 20–year terms for the attempted murder and home invasion charges, and the same sentence as Jones on one aggravated battery charge. The trial judge vacated all other judgments against Burns.

Burns now petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254 (1982). He contends that the State of Illinois is imprisoning him illegally, and gives three reasons why. The state has answered and has filed the record in this case in accordance with the Rules Governing § 2254 Proceedings. The court will now address each of Burns's contentions.

■ Burns first submits that the Illinois trial court asked insufficient questions of the venire in his case about the presumption of innocence and a criminal defendant's right to refrain from testifying. He contends that this deficient inquiry violated his rights to due process and a fair trial under the Sixth and Fourteenth Amendments to the Constitution. The State responds that Burns never raised this objection before the Illinois courts, and for this reason Burns may not raise this objection here. This court disagrees. Contrary to what the Illinois Appellate Court says in this regard, see *People v. Jones and*

*Burns,* No. 88–221, Mem. Op. at 8 (Ill.App. April 21, 1988), counsel for Jones and Burns did point out to the trial court that it had inadequately probed the issues of the presumption of innocence. See R. 814, 818–21, 824–26. When the trial judge asked the attorneys later if they wished the court to ask supplemental questions, counsel repeated their request for questions into these issues. The trial court declined. See R. 888–89. Jones raised this as an error in a motion for new trial, a motion which Burns joined. See R. 3958, 3614. Burns thus has properly preserved this question for this court's review.

The voir dire of the venire in a criminal case serves two important functions under our Constitution. It first protects the defendant's right under the Sixth and Fourteenth Amendments to an impartial jury. See *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (White, J.); *Ristaino v. Ross,* 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 1020 n. 6, 47 L.Ed.2d 258 (1976). It also affords the defendant due process, not only in insuring that his case is heard by an impartial finder of fact (a right which harkens back to those under the Sixth and Fourteenth Amendments), but also by allowing a defendant to exercise any peremptory challenges granted to him by the state in an intelligent manner. See *Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. at 1634; *Ristaino,* 424 U.S. at 595 n. 6, 96 S.Ct. at 1020 n. 6; *U.S. v. Robinson,* 832 F.2d 366, 368 (7th Cir.1987). The constitutional role of the court in voir dire "is simply to ensure that the jury to be impaneled will be an impartial one. To so ensure juror impartiality, the ... court must make inquiry that is sufficient to allow it to perform its 'responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence....'" The court also "must protect 'the defendant's right to exercise peremptory challenges' where they are allowed." *Id.,* quoting *Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. at 1634.

The Seventh Circuit announced its standard of review of a judge's conduct of voir dire in *United States v. Lewin,* 467 F.2d 1132, 1137 (7th Cir.1972): "At some happy mesne point, there must be permitted sufficient questioning to produce, in the light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." While the *Lewin* court may have announced its standard in terms of Rule 24(a), Fed.R.Crim.P., later courts have employed it in testing the sufficiency of a voir dire under the Sixth Amendment. See, for example, *United States v. Hasting,* 739 F.2d 1269, 1273 (7th Cir.1984); *Robinson,* 832 F.2d at 368; *U.S. v. Casey,* 835 F.2d 148 (7th Cir.1987).

Selection of the jurors in this case proceeded in three stages, which yielded twelve jurors and two alternates. In each stage the trial judge began examination of the prospective jurors by telling all of them that the defendants were presumed to be innocent, and that that presumption remained with the defendants throughout the trial until the jury was satisfied by evidence beyond all reasonable doubt as to the guilt of the defendants. Repeatedly the judge insisted that "the burden of proving the guilt of a defendant beyond all reasonable doubt is on the State.... [The defendants] do not have to prove their innocence." R. 845–46. The judge then questioned each prospective juror individually. He asked if each understood the burden of proof, and if each would hesitate to acquit the defendants if the State did not meet its burden. He also asked each prospective juror if he or she could disregard his or her views of the law, and rely solely on the judge's instructions. At the close of evidence these instructions included one to ignore the failure of the defendants to testify, and to uphold the defendants' presumption of innocence.

The court concludes from the record that the trial judge sufficiently questioned each juror to allow the trial judge to gauge each prospective juror's impartiality, and to allow Burns's counsel to decide knowledgeably whether to challenge a particular prospective juror. Contrary to Burns's suggestion, the trial judge specifically questioned the prospective jurors about the pre-

sumption of innocence. As for Burns's right not to testify, the judge did not question the prospective jurors about this point, but before questioning each he pointed out that the defendants did not have to prove their innocence. Later he questioned each juror to see if he or she would follow the judge's instructions as to law in the case. Each prospective juror indicated that he or she would. Coupled with the judge's thorough questioning about the burden of proof, this question provided the court and Burns's counsel with enough knowledge to gauge if a prospective juror would hold Burns's silence against him. This court thus concludes that the State did not deprive Burns of his right to an adequate voir dire under the Sixth and Fourteenth Amendments.

Burns next claims that the prosecution violated his rights under the Fifth and Fourteenth Amendments by commenting on his decision not to testify at the trial. Burns submits that the prosecution referred four times in its closing argument to his decision. On the first occasion, the prosecutor indicated to Burns and called him "the forgotten man...." R. 3383. Burns's trial counsel raised no objection to this comment at the time, but he did object in post-trial motions, arguing that it drew attention to Burns's silence. Later the prosecutor told the jury in reference to Jones, who did testify:

> Remember when you came into this courtroom and were asked questions such as "You will not give a police officer, an Assistant State's Attorney's, testimony any greater weight merely because of his position[?]" Well, ladies and gentlemen, the defendant does not have to testify in a criminal case and that's his absolute right. But when one does, then his testimony is not to be given any greater weight merely because he's the defendant.

R. 3387-88. Burns's counsel again did not object to this comment at the time, and argued only later that it indirectly drew attention to Burns's silence.

The prosecutor's more direct comments came later. After summing up a discus-sion relating to Jones, the prosecutor announced, "Let's talk about Mr. Burns for a minute. Mr. Burns has an absolute constitutional right not to testify." Burns's counsel objected to this comment on constitutional grounds, and the court overruled it. The prosecutor then said, "But they did present you something." Jones's counsel objected, and after a brief colloquy the trial judge sustained the objection and told the jury to disregard the prosecutor's last comment. R. 3398-99. Soon the jury heard counsel for each defendant give his closing argument, and then were treated to the prosecution's rebuttal. The prosecutor directed the jury's attention to several points, one of them relating to Burns: "Mr. Burns is, somewhat, the forgotten man. As I said, there's been—we've been through about a week of testimony about Mr. Jones, primarily. Mr. Burns need not present any testimony." R. 3477. Burns's counsel did not object to this remark at the time it was made.

■ It is axiomatic that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the State by reason of the Fourteenth Amendment, forbids ... comment by the prosecution on the accused's silence...." *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). The Fifth Amendment's prohibitions against prosecutorial comments on a defendant's silence extend beyond those instances where the government says something explicit about that silence. The Amendment covers those occasions where the prosecution manifestly intends its statement to be such a comment, or where the statement is "of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.1968); see also *Williams v. Lane*, 826 F.2d 654, 664 (7th Cir.1987).

■ The prosecution's third and fourth statements were direct comments on Burns's failure to testify, and they violated Burns's Fifth Amendment rights. The first and second statements, by contrast,

were not improper. Neither evinces a manifest intent to be a comment on Burns's silence, although had the prosecution made the first "forgotten man" comment after the fourth of its statements, this court might have reached a different conclusion. The first two statements also were not of a character that the jury would "naturally and necessarily" take them to be comments on Burns's silence. A more natural interpretation of the first comment would have been that Burns was an onlooker to Jones's mayhem. As for the second comment, the jury more likely took it to be a comment on the weight it was to give to Jones's testimony. To call it a comment on Burns's lack of testimony, especially when Burns was not mentioned, would be to impose an unnatural construction on the statement. Burns's failure to object to these two statements upon hearing them buttresses this court's interpretation of them. See *United States v. Muscarella*, 585 F.2d 242, 250 (7th Cir.1978) (court may consider counsel's failure to object as evidence that jury did not naturally and necessarily interpret statement as improper comment).

This court's finding that two of the prosecution's comments violated Burns's Fifth Amendment rights does not end the matter, however. According to *Chapman v. California*, 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–28, 17 L.Ed.2d 705 (1967), the Constitution allows a state to transgress the Constitution with impunity if the State can demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." This court must look at all of the evidence introduced against Burns in order to determine whether the State has met this burden here, as the State did not avail itself of the only direct method of curing its improper comment: through a clear, unambiguous, and immediate curative instruction. See *United States ex rel. Miller v. Greer*, 789 F.2d 438, 447 (7th Cir.1986) (en banc), rev'd on other grounds sub nom. *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1986), and vacated sub nom. *Miller v. Greer*, 832 F.2d 1057 (7th Cir.1987) (en banc) (clear, immediate, and unambiguous instruction the only way to avoid subject-

ing Fifth Amendment violation from analysis under harmless error standard); *United States v. Handman*, 447 F.2d 853, 855 (7th Cir.1971) (same). While no one asked for an instruction pertaining to the second "forgotten man" comment, when the defendants asked the trial court to deliver an instruction to the previous direct comment on Burns's failure to testify, the trial court's directions were ambiguous and unclear. This court will thus look at both improper comments and determine if they amount to harmless errors under *Chapman*.

█ Under Illinois law, a person is accountable for the criminal acts of another when, "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets or attempts to aid, such other person in the planning or commission of the offense." Ill.Rev.Stat. ch. 38, § 5–2 (1979). The state can prove the intent required under this provision when it demonstrates beyond a reasonable doubt that the accused shared the criminal intent of the other offender, or that there was a community of unlawful purpose. See *People v. Gray*, 87 Ill.App.3d 142, 147, 42 Ill.Dec. 441, 445, 408 N.E.2d 1150, 1154 (1980). Mere presence at the scene of the crime or knowledge that a crime is in progress ordinarily is insufficient to demonstrate intent, but active participation in the criminal act need not be shown. See *People v. Underwood*, 108 Ill.App.3d 846, 853–54, 64 Ill. Dec. 415, 419, 439 N.E.2d 1080, 1084 (1982); *Gray*, 87 Ill.App.3d at 147, 42 Ill.Dec. 441, 408 N.E.2d 1150. Rather, a jury can give due regard to the surrounding circumstances—including the accused's presence at the scene of the crime—and determine whether they indicate a sufficient community of interests. *Id.*

█ Based on the evidence introduced at trial, this court judges the evidence of Burns's accountability for Jones's actions to be overwhelming. The evidence shows that Burns and Jones had been drinking at Burns's apartment late into the evening of October 1, 1982. Shortly after midnight the two men left, telling Burns's wife, Eva,

that they were headed for a liquor store. Later they appeared at the Carlsten residence, where Burns used his acquaintance with Arthur and Barbara to gain entry into their home. Burns did all of the talking for the defendants, explaining that their car had broken down and that they needed to use the telephone. Once inside Burns continued to do the talking for himself and Jones.

Minutes later, as Arthur Carlsten struggled with Jones in the kitchen, Arthur called to Burns for help. Burns stood by less than four feet away, and did and said nothing. Burns then went and got Barbara, and motioned her into the kitchen. As Barbara reached her husband and struggled valiantly with Jones, Burns did nothing except watch and smile. Once Barbara telephoned the operator, Burns and Jones retreated to the Carlstens' living room, had a quick conversation, then fled. Police picked up Burns a short time later, and they asked Burns to show them where his car was. It was not where he had told the Carlstens—abandoned in a roadway, the victim of car trouble—but rather in the parking lot of a housing development located less than two blocks away.

This evidence—Burns's accompanying Jones to the Carlsten residence, his talking for the two of them at the residence, his misdescription of the location of his car, his standing by in silence during the attacks on Arthur and Barbara, his role in guiding Barbara to the kitchen, and his failure to report the events at the Carlstens to the police following Jones's attack—overwhelmingly suggests a community of interest between Jones and Burns, such as would support a finding beyond a reasonable doubt of Burns's accountability for Jones's criminal acts under Illinois law. This evidence came from the Carlstens, Schaumburg Police, and Eva Burns. The prosecution's comments about Burns's silence did not enhance this evidence to any significant degree. The evidence was substantial before the prosecution noted Burns's silence, and it would have resulted in Burns's conviction regardless of the prosecution's comments.

The only reservation the court has in this regard is not to the quantity of evidence indicating Burns's accountability for Jones's acts, but to what sort of person for whom the State could have held Burns accountable. This is the thrust of Burns's third objection to his conviction. At trial, both Jones and Burns relied to a degree on defenses of intoxication. They introduced evidence of their substantial drug and alcohol use from September 29, 1982 through the night of the attacks on the Carlstens. There was evidence that during this time Jones ingested alcohol, phencycladine (also known as "PCP"), and quaaludes. He also introduced evidence of his addiction to PCP, and demonstrated a history of abuse of alcohol and other substances dating back to five years before the Carlsten incident.

During a conference over the jury instructions, lawyers for Jones and Burns proposed various instructions relating to the effect of intoxication on a person's criminal responsibility under Illinois law. The trial court denied these instructions, and on review the Illinois Appellate Court affirmed this decision. The Court held that "given the degree of calculation required to commit the offenses, we find the evidence of the defendants' guilt so substantial that any assumed error in the trial court's refusal to give the requested instructions ... was harmless." *Jones and Burns*, Mem. Op. at 9.

Burns reiterates here his contention that the trial court committed "reversible error" in not instructing the jury as to the voluntary intoxication defense. He has cited numerous Illinois and federal authorities which state this principle, but those cases are inapposite here. This court does not sit "to correct errors made by state courts in the interpretation and application of state law." *Williams*, 826 F.2d at 659. Rather, this court can review only those claims that the State violated federal law. Whether an instruction was proper under Illinois or federal practice is not of moment. Rather, a person who collaterally attacks a state court's failure to give a requested instruction must demonstrate

that this failure " 'so infected the entire trial that the resulting conviction violates due process....' " *United States ex rel. Swimley v. Nesbitt,* 608 F.2d 1130, 1132 (7th Cir.1979), quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

■ At one time the Seventh Circuit suggested that when the issue is the state court's failure to give an instruction, rather than an alleged error in an instruction which the court actually delivered, the courts should confine their inquiry to two things: whether the trial court properly instructed the jury on the government's burden of proving every element of the crime charged beyond a reasonable doubt, or whether the instruction reflects a " 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental....' " *Swimley,* 608 F.2d at 1133, quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). The petitioner in *Swimley* confronted the court with the question of whether the Constitution required a court to give a cautionary instruction regarding the testimony of accomplices or immunized witnesses. This instruction pertained to the weight of the testimony of particular witnesses, however, and not the issues which the jury should consider in its deliberations.

The Seventh Circuit addressed the latter problem in *United States ex rel. Peery v. Sielaff,* 615 F.2d 402 (7th Cir.1979). There petitioner Peery contended that the state court violated his constitutional rights in a murder case by not instructing the jury as to its ability to find him guilty of the lesser offense of voluntary manslaughter. Peery contended that the jury could find him guilty on this theory if it found he had acted on a sudden and intense passion aris-

ing from a serious provocation. The *Peery* court recognized the "well established" principle that "a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has 'some foundation in evidence, "even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." ' " *Id.* at 403, quoting *United States v. Creamer,* 555 F.2d 612, 616 (7th Cir.1977). Nevertheless, the *Peery* court reasoned that it could overturn a conviction in a habeas corpus proceeding only if the evidence supporting the defense was so "unequivocally strong that failure to give the instruction could be said to have amounted to a fundamental miscarriage of justice." *Peery,* 615 F.2d at 404 (footnote omitted).[1]

Under the Illinois law in effect at the time of Burns's trial, "[a] person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either: (a) negatives the existence of a mental state which is an element of the offense; or (b) is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ill.Rev.Stat. ch. 38, § 6–3.[2] Burns does not argue that his intoxication negated his own intent to promote or facilitate the commission of Jones's acts. Rather, Burns contends that Jones was so intoxicated that Jones lacked intent. If Jones lacked the requisite intent, then he did not commit his offenses, and if Jones did not commit an offense, the logic goes, Burns could not be accountable for Jones's criminal actions, unless the State demonstrates that Burns caused them.

The court in *People v. Crosser,* 117 Ill. App.3d 24, 27–28, 72 Ill.Dec. 604, 608, 452 N.E.2d 857, 861 (1983) (citations omitted),

1. The Seventh Circuit subsequently declared in *United States ex rel. Reed v. Lane,* 759 F.2d 618, 623 (7th Cir.1985), that the analysis undertaken by the *Peery* court was under the Sixth Amendment's guarantee of the right to trial by jury. The *Reed* court suggested that some failure-to-instruct cases could present due process challenges, where the jury instructions fail to reflect the legal prohibition as it appeared at the time of the alleged criminal offense. Burns has not

argued that the trial court's failure to instruct the jury violated this particular constitutional right.

2. Effective January 1, 1988, Illinois amended § 6–3(a) to read "Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense." 1987 Ill. Laws 2817, § 1.

described the voluntary intoxication defense under Illinois law:

> Voluntary intoxication is a defense to a specific intent offense ... if the condition of intoxication negates or makes impossible the existence of the mental state which is an element of the crime. In other words, the degree of intoxication which will absolve the defendant of responsibility for his criminal conduct must be so extreme that it suspended entirely the power of reason, or rendered the defendant wholly incapable of forming the requisite intent to commit the crime in question.

In most of the reported Illinois cases, persons who raised the defense of voluntary intoxication were unsuccessful, yielding the curious result that it is easier to see when a defendant cannot establish the defense than when he or she can. The State usually succeeds in overcoming the defense in the reported cases in one of two ways: by demonstrating through the accused's own testimony that he or she recalls details before, during, and after the offense, see, for example, *id.* at 28, 72 Ill.Dec. 604, 452 N.E.2d 857; *People v. Feagans*, 119 Ill. App.3d 941, 948, 75 Ill.Dec. 465, 469–70, 457 N.E.2d 459, 463–64 (1984) (accused's detailed statements to police and his trial testimony indicated that his reason was not suspended at the time of offense); *People v. Thompson*, 125 Ill.App.3d 665, 676–77, 80 Ill.Dec. 928, 937, 466 N.E.2d 380, 389 (1984) (defendant's ability to testify "with clarity and in detail" about events before, during, and after armed robbery prevented him from establishing voluntary intoxication defense); or by offering ample evidence of the accused's purposeful actions, see, for example, *People v. Arnold*, 104 Ill.2d 209, 215–17, 83 Ill.Dec. 561, 564–65, 470 N.E.2d 981, 984–85 (1984) (totality of circumstances, including evidence of defendant's purposeful actions and keen abilities under difficult conditions, indicated knowing or intentional conduct); *People v. Bradney*, 170 Ill.App.3d 839, 856, 121 Ill. Dec. 306, 317, 525 N.E.2d 112, 123 (1988)

(same); *People v. Hayes*, 173 Ill.App.3d 1043, 1048, 123 Ill.Dec. 567, 571–72, 527 N.E.2d 1342, 1346–47 (1988) (same).[3]

The State successfully employed both methods here. Jones's trial testimony was wholly consistent with his defense of intoxication, as he could recall very little about the events of October 1–2. Nevertheless, the State presented Diane Ghaster, an Assistant State's Attorney, who testified that on the afternoon of October 2 Jones gave a statement to her in which he recalled the events of October 1–2 in more detail than he presented at trial. Jones claimed that he and Burns had experienced car problems after leaving Burns's residence, and that Burns suggested going to the Carlstens' to visit their son. Jones told Ghaster that when they arrived at the Carlstens', Arthur opened the door and spoke with them; Jones did not see Barbara. Burns then told Jones to call Eva Burns, which Jones claimed he did. Eva did not answer. Jones told Ghaster that Arthur had offered them a ride, which they refused. Arthur then reportedly let Jones and Burns out the kitchen door, and the men departed for a convenience store. Jones denied stabbing either of the Carlstens, being on drugs during October 1–2, or lacking recall. Ghaster testified further that during her interrogation of Jones, Jones appeared lucid and alert.

The State introduced more than Jones's statement to Ghaster to refute Jones's defense of intoxication. Jones admitted at trial that he had driven to Lake Geneva, Wisconsin, and back in the days prior to October 1, despite being intoxicated. Police stopped him and Burns several times on their return trip, but each time Jones cooperated with police and indicated he understood what what was happening to him—despite his allegedly profound intoxication. After returning to Schaumburg and joining the Burnses at their home on the evening of October 1, Jones once again ingested alcohol, PCP, and quaaludes. As a result, he appeared intoxicated, but he was not so intoxicated that he could not

---

**3.** Although the Illinois courts decided *Bradney* and *Hayes* after the jury convicted Burns, this court refers to them only as good examples of a traditional method of overcoming the voluntary intoxication defense, and not as authorities that bound the Illinois courts in deciding Burns's case.

drive. Because her husband's license had been revoked, Eva Burns gave Jones the keys to their automobile, so that Jefferey Burns and Jones could go to a liquor store. Jones told Ghaster that he did the driving that night, and maneuvered the car to the other side of Schaumburg to get to the Carlstens' residence. When Jones and Burns appeared at the door, according to the Carlstens, neither man looked or acted intoxicated. Jones followed Burns's directions, going to the kitchen to attempt a call.

This court has reviewed the trial record in this case, and recognizes that Jones introduced evidence that suggested he was intoxicated. Had this court conducted the trial, it may have exercised its discretion and given an instruction of the defense of voluntary intoxication. Nevertheless, this court can reverse Burns's conviction under 28 U.S.C. § 2254 only if the evidence supporting his defense of voluntary intoxication was so "unequivocally strong" that the failure to give an instruction relating to the defense amounts to a "fundamental miscarriage of justice." *Peery,* 615 F.2d at 404. The evidence supporting Jones's defense is not unequivocally strong; in fact, it comes close to demonstrating amply that despite Jones's intoxication, his powers of reason were not suspended. The court notes further that regardless of the trial court's failure to instruct the jury on this defense, the jury had to find that Jones acted knowingly or intentionally on each of the charges against him. The court properly charged the jury with the elements of the offenses and the State's burden of proof with respect to each element. The jury had the evidence of Jones's impairment as well as the elements the State had to prove; the jury would not have convicted Jones had it believed his story about his not knowing what he was doing on the night of October 1–2.

The court thus denies Robert Jefferey Burns's petition for a writ of habeas corpus.