THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAULA GRAY, Defendant-Appellant.

First District (5th Division)   No. 79-465

Opinion filed August 8, 1980.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Joel A. Eisen-Stein, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder, rape, and perjury and given concurrent extended sentences—50 years for each of two murders, 50 years for rape, and 10 years for perjury. On appeal, she contends that (1) she was not proved accountable for the crimes beyond a reasonable doubt; (2) her sixth amendment right to conflict-free counsel was violated; and (3) the sentences imposed were erroneous.

It appears that on May 11, 1978, Carol Schmal was visiting her fiancee, Larry Lionberg, at the gas station where he was working the after-midnight shift and that two friends (Sharon Maccaro and Pete Wonder) who had stopped by left the station at about 2:15 a.m. At about 6:30 a.m., Clemente Moreless, the station manager, arrived and found it unattended.

Later that morning, a police officer made a determination that there had been an abduction and armed robbery. The next day, the body of Lionberg was found in a field next to Cannon Lane in East Chicago

Heights, and that of Schmal was found nude from the waist down (except for knee socks) in an upstairs room in a nearby abandoned building at 1528 Cannon Lane. An autopsy disclosed that two bullets had entered the back of Lionberg's head and one had entered his back, and that two bullets had entered the head of Schmal at short range.

It appears that police investigator Pastirik and other officers, acting on an anonymous call to police headquarters, went to an area outside the 1528 Cannon Lane building to look for a red Toyota; that Pastirik observed two black males (later identified as Dennis Williams and Verneal Jimmerson) walk briskly south of the building; that they seemed to quicken their pace when they saw the officers; that after the two men walked up to a red Toyota, he and his partner stopped them; that he interviewed Williams, and the other officer spoke with Jimmerson; and that both men and the red Toyota were taken into police custody. Later that same day, defendant came to the Homewood police station with several other persons—including her mother and sister.

Investigator Houlihan testified that he and Officer Jackson interviewed defendant that evening at the police station and, after telling her that she had a right not to speak to him, he questioned her for about 10 minutes; that she appeared scared and stated she was afraid of Dennis Williams; that the officers told Mrs. Gray (defendant's mother) of their belief that defendant had information relative to the homicides; and that Mrs. Gray encouraged defendant to cooperate with the police. Defendant then told the officers that Dennis Williams, Kenny Adams, and "Tuna" were present the night of the murders.

Pastirik testified also that Paulette Gray, defendant's sister, informed him that defendant told her she was present during the homicides; that Paulette told defendant that she (Paulette) had informed the investigators about defendant's presence during the murders; that Mrs. Gray then told defendant to tell the truth; and that defendant then gave him the following account of what happened the evening of the homicides.

She and her boyfriend, Kenny Adams, were in his car (a beige Toyota) listening to music. After sitting in the car for quite some time, she went into the house. Hearing noises later, she looked out her living room window and saw men trying to get Dennis Williams' red Toyota out of the mud. She left the house and entered an abandoned building next door, where she hid to watch what was occurring. She saw Dennis Williams, Verneal Jimmerson (Lurch), Kenny Adams, and Willie Rainge (Tuna), in addition to seeing a white man and a white woman who were unknown to her. The two white people were taken out of the car and pushed ahead by Williams who walked over to her, grabbed her by the arm, and told her to come with them. Everyone then went across the courtyard into a building located at 1528 Cannon Lane—where Williams, the white woman,

defendant, Adams, and Jimmerson went upstairs to a second floor bedroom while Rainge stayed downstairs with the white man. Williams put the white female down on the floor and removed her clothes, excepting her socks and upper garments. Williams then handed defendant a disposable "Bic type" cigarette lighter and told her to light and hold it, since it was very dark. She did so, and Williams, Jimmerson, and Adams had sexual intercourse with the white woman. When Adams finished, Jimmerson went downstairs and Rainge came upstairs and also had sexual intercourse with the victim. While this was going on, the cigarette lighter on occasions would go out and Williams would yell at defendant to relight it—which she did. Williams and Rainge had sexual intercourse with the victim a second time, but when she pleaded with Adams not to do so again, he did not. Rainge then went downstairs, and Jimmerson came up and raped the white woman a second time—following which Williams took a gun out of his pocket, pulled her over face down, and fired two shots into her head. Williams, Rainge, and defendant then walked the white man across Cannon Lane at gunpoint into a field near Deer Creek, where Williams fired two shots into the victim's head and handed the gun to Rainge, who fired one shot into the man's back. The three then walked along the creek, where Williams threw the gun into the water and then said to her that if she told the police or anyone about the incident he would kill her and her family. The group dispersed, and she went home. The next morning, defendant told her sister Paulette and her mother what happened.

It was the testimony of Officer Houlihan that on the evening of May 13 he, two investigators, and other officers went to the scene of the homicides with defendant, where she attempted to show the officers the location of the victim's boots. They could not be found, but she did point out to the officers where Williams threw the gun away.

Ernest DiBenedetto, an assistant State's Attorney, testified that when he interviewed defendant on May 14, she related the same account she had given to Pastirik and, because both defendant and her mother appeared to be in fear, he told them the State would look into the possibility of relocating them.

It appears that on May 16, defendant appeared before the grand jury and related substantially the same story she told investigator Pastirik and the assistant State's Attorneys concerning the homicides. However, on June 19, when she testified at the preliminary hearing of Williams, Rainge, Adams, and Jimmerson, she said that her grand jury testimony was a lie which she had been coerced by the State to tell and that she knew nothing regarding the crimes committed against Carol Schmal and Larry Lionberg. Thereafter, an indictment charged her with perjury and the crimes committed against Larry Lionberg and Carol Schmal. She was

tried simultaneously with Dennis Williams, Willie Rainge, and Kenneth Adams—but by a separate jury.[1]

At trial, the transcripts of defendant's grand jury testimony and of her recantation at the preliminary hearing were introduced by the State. Michael Podelecki, an Illinois Law Enforcement forensic scientist, then testified that the hair of Carol Schmal was similar in color and characteristics to the hair found in the trunk of Williams' red Toyota; that even at the highest magnification, he could not ascertain any dissimilarities between the hair samples; that the examination of the vaginal swab of Carol Schmal, when compared with saliva and blood samples of Williams, Adams, and Rainge, disclosed that they may have had sexual intercourse with her prior to her death.

Charles McCraney testified that he lived four buildings away from defendant's residence; that on the evening of May 10, 1978, and the early morning hours of May 11, 1978, he was practicing his guitar in his downstairs living room; that periodically he would go upstairs and look out his window to make sure teenagers were not tampering with his Cadillac; that at about 3 a.m. on May 11 he observed a blue Chevy parked next to a beige Toyota in front of defendant's house; that Kenneth Adams and defendant were in the Chevy; that later he saw a red Toyota with the other two cars; that he then saw a yellow Vega, driven by Rainge, stop next to the red Toyota; that the cars were in the same position when he looked again about 15 minutes later but that the red Toyota was then driven under a nearby streetlight where Williams got out, broke the streetlight with a rock, and then backed the red Toyota into a parking area; that he saw Rainge leave the Vega and get into the red Toyota, which was then driven east on Hammond Lane; and that, when he went outside to inspect his car, he saw defendant and an unknown man sitting in the blue Chevy. Later, after returning to his house, when he heard the revving of a motor he again looked out his front window and saw that the red Toyota was struck in the mud; that he went to a back window to check on his car and saw four people—including Adams—get out of the beige Toyota and run toward the building at 1528 Cannon Lane, but he did not see defendant get out of that car; that he returned to a front window and saw a group of six to eight people enter the building located at 1528 Cannon Lane, included among them being Williams, Rainge and Adams; that later he heard a gunshot but, as they were commonplace in that neighborhood, he took no action; that in the late morning of May 11, he saw Dennis Williams drive up in a red Toyota, stop under the light he had broken previously, and proceed to kick the glass from the street; and that Williams then parked his Toyota in front of defendant's home. Finally, McCraney testified that after the bodies of Schmal and Lionberg

---

[1] Charges against Verneal Jimmerson were dismissed after the preliminary hearing.

were discovered, he saw Williams among the crowd that had gathered; and that, on the basis of comments Williams made to a friend at that time about the shootings as well as his earlier observations, he contacted the police.

Defendant testified on her own behalf. In essence, she stated that she had not been present during the commission of the crimes; and that statements made to the police, to the assistant State's Attorney, and to the grand jury were police-coerced lies.

Opinion

Defendant first contends that the State failed to prove her legally accountable beyond a reasonable doubt for the rapes and the murders. By statute, one is legally accountable for the acts of another when:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).

■■ In establishing legal accountability for the acts of another the State is deemed to have met its burden of proving the specific intent to promote or facilitate the commission of the crime where it proves " 'beyond a reasonable doubt that defendant shared the criminal intent of the principal, or that there was a community of unlawful purpose.' " (*People v. Hill* (1977), 53 Ill. App. 3d 280, 284, 368 N.E.2d 714, 717; *People v. Ramirez* (1968), 93 Ill. App. 2d 404, 411, 236 N.E.2d 284, 288.) Although mere presence at the scene of the crime or negative acquiescence in another's actions is ordinarily not sufficient to establish accountability, one may nonetheless be held to aid and abet without actively participating in the overt act. (*People v. Ray* (1979), 80 Ill. App. 3d 151, 399 N.E.2d 977; *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 390 N.E.2d 571.) Furthermore, proof of community of purpose or common design need not be expressly stated but may be drawn from the circumstances surrounding the commission of the act (*People v. Mertens* (1979), 77 Ill. App. 3d 791, 396 N.E.2d 595; *People v. Hunter* (1979), 69 Ill. App. 3d 732, 387 N.E.2d 1018), which may include an accused's presence at the commission of the crime without disapproving or opposing it (*People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411; *Hunter*). Moreover, while accountability requires that the assistance of an accused occur prior to or during the commission of the act, such assistance can be inferred from activities occurring after the offense. *People v. Clifford* (1976), 38 Ill. App. 3d 915, 349 N.E.2d 922; *Crutcher*.

Defendant maintains that she told the truth at the preliminary hearing

and at trial, but, even assuming her prior statements and grand jury testimony were the truth, she argues that the State failed to prove beyond a reasonable doubt she had the specific intent to promote or facilitate the crimes. This, she says, is clear because the statements to the officer and the State's Attorney and her grand jury testimony show that she was forced by Williams to go with him and the other three men; that she was ordered by Williams to hold the lighter during the rapes and murder of Schmal; and that she was forced by Williams to go with him to the place where Lionberg was shot.

We initially note that defendant had known the four participants prior to that evening and, in fact, had been with one of them (Adams) for a few hours earlier. In her grand jury testimony, she stated that after leaving the company of Adams she went to her home at 1527 Cannon Lane and, hearing noise, she looked out the window and saw Williams's car stuck in the mud. She went out her back door, into an abandoned building at 1528 Cannon Lane, to watch what was happening. While there, she saw the participants take two white people from Williams's car and that Williams then "came over and got me by the hand and he told me to come with him and I told him to turn my hand a-loose and he said, 'Follow me.'" She said that she then followed the four men and the white man and woman, who were told by Williams to go into 1528 Cannon Lane, a vacant apartment building. There, she, Schmal and Williams went to the second floor. Williams gave her a lighter and told her to light and hold it so that he could see what he was doing. She held the lighter during the rapes and shooting of Schmal. At her request, Adams did not have intercourse with Schmal a second time as the others did. Following the shooting, she said Williams "took my hand and told all of us to come downstairs" where Lionberg had been held. She then testified that "they took him outside. Dennis [Williams] still had me by the hand." She said they went over by a creek, where Williams shot Lionberg—after which Williams told her not to tell the police or he would kill her and her family.

In the above testimony, defendant points to two instances to support her contention that her presence during the crimes against Schmal was forced. First, she says that Williams took her by the hand and told her to follow him. It is noted, however, that she told him "to turn my hand a-loose and he said, 'Follow me,'" and she then followed him. From this testimony, it is argued that Williams did not let her hand loose and forced her to follow; but it appears to us that the jury could reasonably have considered it as meaning that she followed Williams after her hand was released, particularly when no verbal threats were made or other physical force was used. As the second supporting instance, she says that Williams ordered her to hold the lighter so that he could see what he was doing. However, we note that she testified that Williams "told" her to hold the

lighter; that he initially "told" her to follow him and that, after the Schmal shooting, he "took her hand and 'told' us all to come downstairs"; and that she said on other occasions Williams "told" various of the men to do certain things. Thus, the jury could also reasonably have believed that she was treated by Williams in the same manner as were the other men and, thus, that her presence was not against her will. In any event, other than her testimony that Williams initially "took her hand" and later "told" her to hold the lighter, the record reveals no other indication that her presence during the offenses committed against Schmal was forced. Neither is it indicated that she made any effort to leave the scene of the crimes or to prevent their commission.

Concerning defendant's presence when Lionberg was killed, we note she said only that after that shooting Williams "took my hand and told us all to come downstairs." She did not say that she was in any other manner required or forced to accompany the men to the nearby creek or to remain there during the shooting of Lionberg. In fact, the record discloses that she was not threatened at any time that evening until after the shooting of Lionberg, when Williams said he would kill her and her family if she told anyone what had happened. This threat, taking place after the crimes, does not support her contention that her presence was forced.

■■ In the light thereof and in view of the fact that the record discloses no attempt on her part to leave (although opportunities to do so must have existed, as Williams obviously was not holding her hand at all times and because it is not contended or indicated that any of the other participants did or would have detained her), we are unable to say that specific intent to promote or facilitate the crimes was not established beyond a reasonable doubt.

■■ Interrelated with defendant's specific intent argument is her next contention that there was a failure to prove beyond a reasonable doubt that she was not compelled by Williams to be present or to hold the lighter and that the trial court should have *sua sponte* instructed on the defense of compulsion. The pertinent statute provides in part:

> "A person is not guilty of an offense, * * * by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1977, ch. 38, par. 7—11.)[2]

Compulsion is an affirmative defense (Ill. Rev. Stat. 1977, ch. 38, par.

---

[2] Once properly raised by "some evidence," the State must overcome it by proof beyond a reasonable doubt to sustain a conviction. (Ill. Rev. Stat. 1977, ch. 38, par. 3—2.)

7—14), and, as stated in the Committee Comments, "[I]f not put in issue by the prosecution's evidence, the defendant, to raise it as an issue, must present some evidence thereon" (Ill. Ann. Stat., ch. 38, par. 7—14, Committee Comments, at 451 (Smith-Hurd 1972)).

In *People v. Ricker* (1970), 45 Ill. 2d 562, 569, 262 N.E.2d 456, 460, the court stated that the compulsion statute is applicable only where there is a threat of "imminent infliction of death or great bodily harm" and the person committing the offense "reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." Here, to support her compulsion argument, defendant asserts only that Williams had initially taken her hand and told her to follow him; that he later told her to hold the lighter; and, after the Schmal crimes, he took her hand again when they left the room—on their way to the shooting of Lionberg. There being nothing in the record indicating imminent infliction of death or great bodily harm or the reasonable belief that such would be inflicted upon defendant if she did not participate, we find the compulsion statute to be inapplicable. Moreover, in *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321, the court held that the quantum of evidence necessary to raise an affirmative defense to require the State to disprove the issue was that the evidence be sufficient to raise an issue of fact creating a reasonable doubt as to defendant's guilt. In the instant case, in the absence of any threat of the imminent infliction of death or great bodily harm or the reasonable belief that such would be inflicted if she did not participate, we find also that the quantum of evidence necessary to raise the affirmative defense of compulsion was lacking. In the light thereof, we hold that an instruction on compulsion would not have been warranted even if it had been offered by defendant.

Defendant next contends that her sixth amendment right to conflict-free counsel was violated. She argues that her representation at trial by attorney Weston (who was also counsel for Williams and Rainge) was an unconstitutional conflict of interest since she had initially been a State's witness against Williams and Rainge. We disagree.

The record reveals that on the day before her grand jury testimony the defendant was housed by the State's Attorney in a motel, where a policewoman stayed with her for her safety. It appears that her mother (Mrs. Gray) contacted attorney Weston after she was given his telephone number by someone whose name she did not remember. Apparently because of Weston's efforts, the police brought Mrs. Gray to see defendant that evening at the motel. The next day, Mrs. Gray was driven by Williams' brother to the courthouse, and she was present when defendant testified before the grand jury. Defendant stayed at the motel that evening but returned to her own home the next day, and a few days later she and her family moved in with the family of Williams. A month

later she appeared at the preliminary hearing of Williams, Rainge, Adams, and Jimmerson walking hand-in-hand with attorney Weston, who was then defense counsel for Williams, Rainge, and Jimmerson. It was at this hearing that she stated she was not present at the crimes and that her grand jury testimony concerning the homicides and rapes had been a lie which the State forced her to tell. At the conclusion of the hearing, she left the courthouse with Weston and, as a result of her recanted testimony, the charges against Jimmerson were dismissed for lack of probable cause. Subsequently, the State charged defendant with perjury as well as the crimes committed against Schmal and Lionberg. Weston filed an appearance as her counsel and, at trial, he represented her as well as Williams and Rainge—with Adams having separate counsel.

The right to effective assistance of counsel is guaranteed by the sixth and fourteenth amendments to the United States Constitution and, as stated in *People v. Berland* (1978), 74 Ill. 2d 286, 299-300, 385 N.E.2d 649, 655, an accused "must show an actual conflict of interest manifested at trial in order to prevail in a constitutional claim of ineffective assistance of counsel due to joint representation of co-defendants by a single attorney"; but, joint representation of co-defendants is not a *per se* constitutional violation (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227). While our supreme court had held that prejudice need not be shown where an actual conflict of interest exists (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858; see also *People v. Echols* (1978), 74 Ill. 2d 319, 385 N.E.2d 644), it is clear that a judgment will not be disturbed on the basis of a hypothetical conflict (*Berland*; *People v. McCasle* (1966), 35 Ill. 2d 552, 221 N.E.2d 227).

Recently, the United States Supreme Court reaffirmed this reasoning in *Cuyler v. Sullivan* (1980), ___ U.S. ___, ___, 64 L. Ed. 2d 333, 346-48, 100 S. Ct. 1708, 1718-19, wherein it said:

"Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where ' "[a] common defense * * * gives strength against a common attack." ' [Citations.]

In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that

an actual conflict of interest adversely affected his lawyer's performance.

\* \* \*

We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."

Here, it is undisputed that no question as to conflict of interest was raised in the trial court and, thus, an "actual conflict"—the "constitutional predicate" for a claim of ineffective assistance (see *Cuyler v. Sullivan* (1980), ___ U.S. ___, ___, 64 L. Ed. 2d 333, 347, 100 S. Ct. 1708, 1719)— must be shown by defendant to prevail on her sixth amendment claim. While it is clear that defendant's defense did not conflict with that of either Williams or Rainge, she nonetheless urges that there was a conflict of interest in that attorney Weston could not advise defendant to adhere to her original version of events since it would be incriminating of his other clients. In her brief, she states that Weston did not advise her "to testify against Williams, Rainge and Jimmerson and thereby quite possibly avoid going to trial at all. He did not ask immunity for Paula so that she could become without any prejudice to herself the sole witness against the other 3 clients. \* \* \* A very strong and probably prevailing defense for Paula would have been for Paula to testify at her own trial that she had been present, that she had been compelled, that she did not intend to promote or facilitate the crimes, that she only recanted at the preliminary hearing out of fear and undue influence by Williams and his representatives." In effect, defendant wishes us to conclude that defendant's grand jury testimony was the truth and that somehow Weston, or some person acting on his behalf, prevailed upon defendant to testify as she did at the preliminary hearing and the trial. However, to accept these arguments, we would have to assume that her grand jury testimony was the truth and was known to be so by attorney Weston. Such an assumption of knowledge by counsel is not supported by the record, as the only testimony given with respect to which of her versions is correct comes from defendant. Moreover, there being no proof of actual conflict, we will not speculate (as we are asked to do by defendant) as to what advice, if any, her attorney should have provided her.

■ We turn, then, to the contention of defendant regarding her sentences. In her brief, she states that:

"In view of Paula's age, mental capacity, lack of prior record, and lack of connection with the crimes committed by Dennis Williams and his cohorts, her extended term sentences of 50 years and 10 years are patently erroneous and must be reduced."

The question thus presented is whether the trial court properly gave her

extended sentences. In this regard, we note that the terms provided in section 5—8—1 of the Unified Code of Corrections for the offenses involved were as follows: For murder, not less than 20 and not more than 40 years; for rape, a Class X felony, not less than 6 and not more than 30 years; and for perjury, a Class 3 felony, not less than 2 and not more than 5 years. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1.) The Code then provides in section 5—8—2 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2) that a sentence in excess of that authorized in section 5—8—1 may not be imposed "unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." Section 5—5—3.2(b) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)) sets forth two factors in the disjunctive:

"(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

Pertinent only is the second factor, and we note that the trial court did make a finding that the offenses here were accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant, pointing to her age, mental capacity, lack of prior record, and lack of participation in the crimes, argues that her conduct was not such that an extended sentence was proper. We note, however, that the application of the statute is determined by the "offense" rather than by the extent or nature of the offender's participation, and there appears no question that the various offenses here were accompanied by conduct coming within the second factor. In view thereof and because we have found her legally accountable for the offenses, we cannot say that the extended sentences given defendant, which are less than the maximums provided for in section 5—8—2, were inappropriate.

For the reasons stated, the convictions and sentences herein are affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.