THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JACKIE WILSON, Defendant-Appellant.

First District (5th Division)    No. 83—0773

Opinion filed December 20, 1985.

Steven Clark, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a joint jury trial, defendant, Jackie Wilson, and his brother, Andrew Wilson, were convicted of two counts of armed rob-

bery and two counts of murder. Defendant was sentenced to concurrent terms of 30 years on the armed robbery convictions and natural life imprisonment for the murders.[1] On appeal, he contends that (1) his post-arrest statement should have been suppressed as the involuntary product of mental and physical coercion by the police; (2) he was denied his sixth amendment right to a representative and impartial jury by (a) the State's use of its peremptory challenges to exclude blacks, and (b) the death-qualification of prospective jurors, which resulted in a conviction-prone jury; (3) the trial court erred (a) in refusing to ask on *voir dire* a supplemental question submitted by defense counsel; (b) denying his motion for a severance, and (c) admitting certain irrelevant and prejudicial evidence; (4) the evidence was insufficient to prove him accountable for the crimes beyond a reasonable doubt; (5) the prosecutor misstated the evidence in closing argument; and (6) mandatory imposition of a natural life sentence was unconstitutional.

The charges arose from the fatal shootings of Chicago police officers William Fahey and Richard O'Brien on February 9, 1982.

Prior to trial, defendant moved to suppress his post-arrest statement as having been the involuntary product of mental and physical coercion by the police. At the hearing thereon, Officers McGuire, Riordan, Nitsche and Kruppel all testified, in substance, that they took custody of defendant from the arresting officers at about 8:30 a.m. on February 14, 1982. He was then handcuffed, advised of his *Miranda* rights—which he indicated he understood—and transported in a squad car to Area 2 police headquarters (Area 2). Defendant never mentioned that he had an attorney or that he wished to speak to him nor did any of the transporting officers draw their weapons jab, slap, threaten or tell defendant that he had no rights. The only conversation they had with him during transit was to inform him, when he asked, where he was being taken. When they arrived at Area 2, at about 10 a.m., they transferred custody of him to Officers McKenna and O'Hara and did not see him thereafter.

Officers McKenna and O'Hara testified, essentially, that defendant was brought in to Area 2 at about 10 a.m., advised of his *Miranda* rights and placed in a second-floor office. When asked by McKenna whether he knew why he had been arrested, defendant responded, "because of the two cops who were killed," and, for the next 20 to 25 minutes, voluntarily answered their questions about the shootings. At

---

[1]Andrew Wilson was sentenced to death. His appeal is currently pending before the supreme court (No. 58276).

about 2:45 p.m. he was taken to Area 1 to appear with Andrew in a lineup.

Assistant State's Attorney Lawrence Hyman then testified that he first saw defendant at about 10:30 a.m., and after advising him of his constitutional rights had a brief conversation with him. Defendant was provided with lunch, consisting of a sandwich, potato chips and a soft drink, after which he gave his written statement—at about 11:45 a.m.—in the presence of Officers McKenna and O'Hara and court reporter Michael Hartnett, who typed it, gave it to defendant to review and sign and then took a Polaroid photograph of him.

According to Hyman, defendant did not complaint of any mistreatment by the police nor was there anything about his appearance to suggest that he had been beaten. On cross-examination, Hyman stated that Officers O'Hara and McKenna were present at all times that he spoke with defendant; that he did not ask defendant if he had been beaten and that he knew defendant had an attorney prior to his arrest, but did not recall specifically asking if he wanted to speak to him. At about 5:30 p.m., Hyman also took a statement from defendant's brother, Andrew, who was being held in another office approximately 35 feet away.

Court reporter Michael Hartnett similarly testified that he did not notice any bruises, cuts or marks on defendant when the statement was made or when he took the photograph of him, nor did he hear defendant complain of physical abuse by the police. Hartnett was also present when Andrew made his statement to Hyman several hours later in an office 35 to 40 feet down the hall.

Defendant testified that following his arrest at about 8:30 a.m., in which approximately 20 officers participated, he was handcuffed, placed in a squad car with four officers and driven to the police station. Without advising him of his rights, they immediately began to question him about the shootings and told him that he was "going to say something." When he denied any knowledge thereof, the officer beside him "elbowed" him in the chest five or six times and the officer in the front seat turned and slapped him in the face several times. Upon arriving at Area 2, he was placed in a second-floor room with about 12 plainclothed policemen and Officers McKenna and O'Hara, who ordered him to sit and told him that because it looked as if he were just a victim of circumstances he should "come straight." He requested to speak to his attorney, whose business card he was carrying, but they told him he "didn't need any [expletive deleted] lawyer." When he refused to talk to them because he was afraid, they hit him with a telephone book and threatened that they would continue to do

so as long as he lied. They also struck him with a dictionary, poked him in the chest and kicked him. After a few hours, McKenna advised him, for the first time, of his constitutional rights and, again, questioned him about the shootings. Approximately 16 officers were present in the room at this time, and because he heard his brother hollering and furniture being kicked, he agreed to answer their questions, believing that if he refused, he "would be next." They asked him about persons named "Kojak" and "Dee," and when he denied knowing them, they dragged him to another room where "Dee" (Derrick Martin) was being held, then returned him to the office and began beating him again. O'Hara twisted his fingers, stepped on his hands, kicked him in the groin and shoved a cocked revolver in his mouth, asking if that made him nervous, but McKenna warned O'Hara and the other policeman "not to damage the face." They then told him what they wanted him to say to the assistant State's Attorney and threatened that if he did not comply, they would ask the attorney to leave and "start all over again." Presuming that they meant they would resume beating him, he agreed and gave a statement, which he later signed, although he added that his handwritten initials appeared different on each page because his fingers were swollen and he was nervous when he signed it. The police refused to allow him to see Andrew unless he agreed to talk his brother into giving a statement. When he next saw Andrew at the criminal courts building on February 15 he (Andrew) was wearing a big patch over his eye and said he had been beaten, and that although the police took him to the hospital, once there they forced him to refuse any treatment.

On cross-examination, defendant acknowledged that he knew, despite not being advised, what his constitutional rights were and stated that he had attained a 12th grade education. At the time of his statement only the assistant State's Attorney, court reporter Hartnett and Officer McKenna were in the room; the other officers who were present during and had participated in the earlier beatings had "disappeared." When he told Assistant State's Attorney Hyman that he would not sign the typed statement without his attorney present, Hyman left the room, "supposedly" to call the attorney; but while Hyman was gone, O'Hara forced him to sign it without reading it, threatening to break his fingers if he refused and later ordered him to smile for the photograph taken by Hartnett. Defendant reiterated his contention that the statement was unwillingly given as a result of the repeated threats and beatings by the police.

Defense counsel requested, and it was agreed, that where rele-

vant, evidence presented at the hearing on Andrew's motion to suppress be considered for purposes of defendant's motion as well. At that hearing Assistant State's Attorney Hyman, Michael Hartnett, Officers McKenna and O'Hara and several arresting officers testified, essentially, that Andrew was arrested, advised of his rights and brought to Area 2 at about 5:15 a.m. on February 14, 1982—several hours before defendant's arrest—and almost immediately gave an oral statement in which he admitted shooting the two officers. He was taken to Area 1 at about 4 p.m. to appear in a lineup and then returned to Area 2, at about 5:30 p.m. whereupon he gave a written statement detailing the circumstances of the shooting. Although Andrew incurred an injury above his right eye in a scuffle incident to his arrest, no one ever threatened, beat, burned or electrically shocked him, nor did any of the witnesses see or hear him being beaten or screaming for mercy and help.

Derrick Martin, an acquaintance of defendant and Andrew who was also brought in to Area 2 for questioning on the morning of February 15, testified that he did not hear or see Andrew being beaten, nor was he personally abused by the police while in their custody. On cross-examination, Martin stated that no cases or charges were pending against him and acknowledged that for purposes of protection, he had been living in a hotel and had received about $2,000 from the State's Attorney's office for living expenses.

Andrew Wilson, however, testified that the police began beating him as soon as he arrived at Area 2 and that he was continually threatened, beaten, kicked, electrically shocked and, finally, handcuffed over a hot radiator throughout which he screamed and pleaded for mercy. Eventually, he submitted to their demands and gave them the statement they wanted. Later that night, two police officers took him to the hospital, but when the doctor left the room, they threatened him and ordered him to refuse medical attention. He obeyed and was thereafter discharged without receiving treatment.

Doris Miller, a neighbor of Andrew and defendant, testified that while in custody at Area 2—having been arrested as an accomplice to these murders—she heard Andrew screaming for mercy and also saw him, as she passed the room in which he was being held, naked from the waist up and handcuffed to a windowsill.

Dr. Geoffrey Korn testified that he was on duty in the emergency room the night Andrew was brought in, and that a visual examination of him disclosed multiple bruises and abrasions—though most were superficial—and a burn on his thigh. He did not treat Andrew, however, because the officers accompanying him had their weapons drawn. He

explained that to them and left the treating room; when he returned, Andrew refused treatment, despite having earlier signed a consent form therefor, and was discharged.

Patricia Reynolds, an emergency room nurse, testified that she saw a laceration and blood on Andrew's forehead, scratches on his chest and a burn on his thigh. She heard one of the officers who brought him in say, "If this guy knew what was good for him, he'd refuse treatment." When she asked Andrew if he wished to be treated, he shook his head, indicating no, but when the officers looked away, he nodded his head, indicating that he did and then signed a consent form. When Doctor Korn came in, however, Andrew again refused treatment and was then discharged.

Dr. John Raba, a physician at the Cook County Department of Corrections, testified that he examined Andrew in the early evening hours of February 15 on the advice of a staff physician who had seen and treated Andrew earlier that day and noted to Raba the unusual nature of the injuries and Andrew's claim that he had been physically abused by the police. In the course of his examination, Dr. Raba noticed that Andrew's right eye was red, but not infected, that he had two lacerations above his eyebrows, two blisters on his face, a long blistering lesion on his right leg, two such lesions on his chest and swelling in his ankles. Dr. Korn drafted a letter to Chicago Police Superintendent Brzeczek regarding his findings. After argument by counsel, both motions to suppress were denied, as were the motions for severance.

In contrast to that introduced at the suppression hearing, the evidence adduced at trial is largely uncontested by defendant.

A few hours before the shootings, defendant, Andrew and Donald "Kojak" White were at White's house discussing a plan to help Andrew's friend, Edgar "Ace" Hope—who had been arrested for the murder of a Chicago police officer a week earlier—escape from Cook County Hospital where he was being held. Andrew's plan was to obtain guns and white uniforms and enter the hospital posing as doctors. When Derrick Martin arrived, defendant and several others were burglarizing the house next door. Although they did not find any weapons there, they did take a coat, a television set and some .38-caliber bullets, which they gave to Andrew for the .38-caliber revolver he was carrying. At about 1:45 p.m., defendant and Andrew left White's house in their sister's brown Chevrolet and were on their way home— after dropping Martin off near his home—when they were stopped by a police car on the 8100 block of South Morgan Avenue. According to his own statement, defendant, who had been driving, got out of the

Chevrolet and walked back toward the squad car, meeting Officer O'Brien, the driver of the police vehicle, at its left front bumper. When defendant could not produce a driver's license, O'Brien patted him down and then walked to the Chevrolet, leaned into the driver's side, removed the .38-caliber revolver Andrew had placed on the front seat, drew his own service revolver and ordered defendant to "freeze." Meanwhile, Andrew exited the car from the front passenger's side, removed his jacket, and threw it onto the front seat, but Officer Fahey, who had approached from the passenger's side of the squad car, ordered him to take the jacket out of the car and hand it to him. Finding the .38-caliber bullets stolen earlier inside the pocket, Fahey informed Andrew that he was under arrest and attempted to handcuff him, but Andrew resisted and in the ensuing struggle, they fell against the left rear side of the Chevrolet. Partially subduing Andrew, Fahey attempted, once again, to handcuff him, but during the continuing struggle, Andrew pulled Fahey's service revolver from its holster and shot him in the back of the head. He then pushed Fahey away, spun around and fired a shot at O'Brien, who, according to defendant, had been holding him at gunpoint throughout the struggle between Andrew and Fahey. As O'Brien fell, Andrew ordered defendant to "get his gun," but when defendant informed him that O'Brien was "still there *** he's up and about," Andrew jumped onto the trunk of the Chevrolet and fired four or five more shots at O'Brien. Defendant stated that Andrew then slid off the trunk, picked up the two guns O'Brien had been holding (his service revolver and Andrew's .38-caliber revolver) and his jacket, shouted, "Let's get out of here" and jumped into the passenger's side of the car. Frightened by what had just occurred, defendant said, in his written statement, that he stood there motionless for a few moments, but when Andrew hollered, "move, move, move," he got into the car and drove it away.

The testimony of Tyrone Sims, who witnessed the shootings from his apartment window, was similar to defendant's in most respects except he did not see Andrew pick up the guns O'Brien had been holding, stating that after firing at O'Brien from the trunk, Andrew slid off the car, walked toward the passenger's door, picked up his belongings, and got into the car, shouting "let's get out of here" to defendant—who, Sims agreed on cross-examination, appeared to be in a state of shock. At that point, Sims left his position at the window to call the police.

Similarly, DeWayne Hardin testified that he and a friend were in a car traveling northbound on Morgan Avenue just after the shootings. As they approached the scene, he saw a squad car with its lights on

and a brown Chevrolet with defendant standing on the driver's side and Andrew on the passenger's side, and two police officers lying on the ground, one on each side of the Chevrolet. As their automobile reached the middle of the block, he saw both men enter the Chevrolet, which then sped away.

Officer O'Brien was pronounced dead on arrival at the hospital from multiple gunshot wounds and Officer Fahey died several hours later as a result of massive brain injuries. Their service revolvers were recovered four days later in a beauty shop owned by a friend of Andrew. As noted earlier, Andrew was arrested in the early morning hours of February 14, 1982, and defendant was apprehended a few hours later.

Opinion

■ We first address defendant's contention that the trial court committed reversible error in refusing to ask the prospective jurors whether they understood that he was not required to testify in his own behalf and whether they would hold it against him or draw any negative inferences from his failure to do so.

The record discloses that prior to jury selection, defense counsel tendered an extensive list of supplemental questions he sought to be included in the *voir dire* examination, among which was the above-stated inquiry regarding defendant's right not to testify. Despite repeated requests that the question be asked, the court refused, stating that the jurors would be properly instructed that he need not testify at trial and that, in any event, the question was inappropriate since it could not be assumed, prior to trial, that he would not do so. Citing *People v. Zehr* (1982), 110 Ill. App. 3d 458, 442 N.E.2d 581, in which it was held that the trial court's refusal to ask that and two other questions submitted by defense counsel was an abuse of discretion, defendant's attorney moved for a mistrial, but the motion was denied and the question excluded.

Supreme Court Rule 234 (94 Ill. 2d R. 234) vests the trial court with broad discretion in controlling both the manner and scope of *voir dire* examination. It provides:

"The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions

shall not directly or indirectly concern matters of law or instructions." 94 Ill. 2d R. 234.

Defendant points out, however, that the holding of the appellate court in *Zehr* has since been affirmed by the supreme court. (*People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062.) In that case, the court reviewed the appellate decision considering the effect of the trial court's refusal to ask three questions submitted by defense counsel prior to jury selection regarding the prospective jurors' understanding of (a) the State's burden of proof, (b) the presumption of innocence, and (c) the defendant's right not to testify. Rejecting the State's argument that these questions were properly refused under Rule 234 as being matters of law on which the jurors were adequately instructed, the supreme court, quoting the appellate court opinion, stated that " '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation] and although they need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire*. The refusal to ask the questions resulted in prejudicial error which required reversal of the judgment." (Emphasis added.) (103 Ill. 2d 472, 477-78, 468 N.E.2d 1062, 1064.) The court also held that "[i]f a juror has a prejudice against *any [one]* of these basic guarantees, an instruction given at the end of the trial will have little curative effect." (Emphasis added.) 103 Ill. 2d 472, 477, 469 N.E.2d 1062, 1064.

In urging that reversal under *Zehr* is not warranted in this case, the State first argues that defendant has waived any error in this regard by failing to raise it in his post-trial motion, citing *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744, as support for its position. In our view *Visnack* is readily distinguishable from the case at bar. There, prior to jury selection, defense counsel tendered a question which appears to have been substantively identical to the one at issue here. The trial court agreed to ask it, but thereafter neglected to do so. Counsel neither objected nor, apparently, brought the matter to the court's attention. On appeal, the court held that this failure to object resulted in a waiver of any error for purposes of review. *People v Visnack* (1985), 135 Ill. App. 3d 113, 124, 481 N.E.2d 744, 751. See also *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275 (no error in trial court's failure to ask question discussed prior to *voir dire* but never actually submitted).

Initially, we note that the purpose of the rule that the failure to specify an alleged error in a written post-trial motion generally constitutes a waiver thereof for purposes of review (*People v. Caballero*

(1984), 102 Ill. 2d 23, 464 N.E.2d 223, *cert. denied* (1984), ___ U.S. ___, 83 L. Ed. 2d 298, 105 S. Ct. 362 (errors alleged on appeal reviewed despite absence of any written post-trial motion)), is to require defense counsel to bring to the trial court's attention any errors in its rulings which may have affected substantial rights of the defendant so as to give it the opportunity to reconsider their propriety (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739), and grant a new trial, if warranted (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739). The same rule applies to situations, like that in *Visnack*, where no objection to the alleged error is made at trial, the underlying rationale being that defense counsel should not be allowed to gain the advantage of reversal through his own failure to act, either intentionally or inadvertently. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

As previously noted, however, in the instant case, unlike *Visnack*, counsel repeatedly requested that the prospective jurors be questioned regarding their attitudes toward defendant's right not to testify, made strenuous objections each time the court refused, brought to the court's attention the appellate decision in *Zehr*, and moved for a mistrial or that a new jury be selected—both of which were denied—on the basis of that holding. Furthermore, the transcript of proceedings reveals that at the outset of the hearing on his oral post-trial motion, defense counsel raised, as a general allegation of error, the trial court's refusal to allow the attorneys to conduct *voir dire* examination. In view of the above, it cannot be said that counsel was not conscientious in bringing the alleged error to the trial court's attention or that the court would likely have reversed its prior rulings and granted a new trial on the basis of this one allegation of error even if it had been included—among the 82 others—in defendant's written post-trial motion, which was denied in its entirety; nor do we believe that the waiver rule was intended to apply to such a situation.

The State additionally asserts that, waiver aside, the *voir dire* examination conducted by the trial court was in substantial compliance with the dictates of *Zehr*, thereby negating the necessity for reversal and retrial. Specifically, it points out that the trial court admonished the venire as a whole and each prospective juror individually that it was the burden of the State to prove defendant guilty beyond a reasonable doubt and that there was no burden upon defendant to prove anything, and then asked each juror whether he or she understood those principles and would follow the law as given by the court at the end of trial. The State syllogizes that "if the jurors knew and accepted that the People had to prove defendant guilty and that defend-

ant did not have to prove anything, then they certainly knew that [he] did not have to testify."

A similar argument, however, was made and rejected recently in *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154. There, the trial court refused to ask prospective jurors the same three questions at issue in *Zehr* on the ground that they concerned matters of law about which the jury would later be instructed. After a review of the trial court's comments and questions prior to and during *voir dire*—which appear to have been virtually identical to those made and asked in the case before us—the *Boswell* court was satisfied that the subjects of the State's burden of proof and the presumption of defendant's innocence were sufficiently broached and that any potential prejudice held by the jurors on these matters was adequately probed as to alleviate any error under *Zehr*. In contrast, however, the court found that the defendant's right not to testify as well as the possibility that the jurors might draw negative inferences therefrom were subjects not covered during jury selection, and held that "[t]he principle that a defendant's failure to testify in his own behalf cannot be held against him is perhaps the most critical guarantee under our criminal process, and it is vital to the selection of a fair and impartial jury that a juror understand this concept. Given the supreme court's pronouncement that *each* of these questions is required to be covered during *voir dire* when requested, we are compelled to reverse the defendant's conviction and remand the cause for a new trial." (Emphasis added.) (132 Ill. App. 3d 52, 56, 476 N.E.2d 1154, 1157-58; see also *People v. Britz* (1984), 128 Ill. App. 3d 29, 470 N.E.2d 1059, *appeal allowed* (1984), 101 Ill. 2d 583, *arguments heard* (June 24, 1985).) As in *Zehr* and *Boswell*, the trial court here expressly refused to ask the question tendered by defense counsel or to otherwise probe the jurors' attitudes toward defendant's right to refrain from testifying. Therefore, it cannot be presumed, as the State would have us do, that the jurors knew and accepted, without bias, that he was not obliged to testify in his own behalf. In any event, it is a well-settled principle that once our supreme court declares the law on any point, its decision is binding on all Illinois courts, and we may not refuse to follow it regardless of what our personal view of that decision may be, because only it has the power to overrule or modify its decisions. (*People v. Jones* (1983), 114 Ill. App. 3d 576, 449 N.E.2d 547.) Consequently, we, like the court in *Boswell*, are compelled to reverse the defendant's conviction and remand this case for a new trial.

We are not persuaded otherwise by the State's argument that the *Zehr* decision should not be given retroactive application, but be

applied only prospectively, a contention which was also raised, analyzed and rejected in *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154. As the court there stated,

"As a general rule, a decision will be applied retrospectively unless the court expressly declares its decision to be a ' " 'clear break with the past,' " ' (*United States v. Johnson* (1982), 457 U.S. 537, 549, 73 L. Ed. 2d 202, 213, 102 S. Ct. 2579, 2587; *People v. Tisler* (1984), 103 Ill. 2d 226, 246, 469 N.E.2d 147), such as when the court explicitly overrules its own past precedent, disapproves a practice it had previously sanctioned, or overturns a well-established body of lower court authority. (*People v. Seats* (1984), 121 Ill. App. 3d 637, 639, 460 N.E.2d 110.) \*\*\*

While it is within the court's inherent powers to give a decision prospective or retrospective application (*Lane v. Sklodowski* (1983), 97 Ill. 2d 311, 319, 454 N.E.2d 322), there is no indication in *Zehr* that the supreme court intended its decision to be applied prospectively. \*\*\* *Zehr* expressly overruled no clear past precedent. Nor did *Zehr* disapprove an established practice that the court had previously sanctioned. The court's own citation of Rule 234 indicates that its ruling was not an abandonment or modification of its prior treatment of its own rule. Nor did it expressly overrule lower court authority which had applied Rule 234. As there is nothing in *Zehr* which suggests that it should be treated as an exception to the general rule of retroactivity, we conclude that *Zehr* has retrospective application." 132 Ill. App. 3d 52, 56-57, 476 N.E.2d 1154, 1158.

Although the State has informed us, in arguments on this appeal, that the issue of retrospective versus prospective application of *Zehr* was argued in *People v. Britz* (1984), 128 Ill. App. 3d 29, 470 N.E.2d 1059, *appeal allowed* (1984), 101 Ill. 2d 583, *arguments heard* (June 24, 1985), until the supreme court holds that its decision was intended to have only prospective application, we conclude that the general rule enunciated in *Boswell, Zehr* was intended to be given retrospective application, and we thus reiterate our holding that this cause must be remanded for a new trial.

In view thereof, we shall briefly address only those of the numerous remaining issues which are likely to recur upon retrial, the first of which is defendant's contention that his statement should have been suppressed because it was involuntarily made as a result of repeated acts of physical and mental coercion by the police.

The test for determining the admissibility of a statement is whether, given the totality of circumstances, it was made freely, vol-

untarily and without compulsion or inducement of any sort, or whether defendant's will was overborne at the time. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) Factors to be considered in this inquiry include, but are not limited to, the duration of defendant's detention and the intensity of any interrogation prior to the statement, his age, education, emotional characteristics and experience in criminal matters and whether he was adequately advised of and allowed to exercise his constitutional rights. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915; *People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127.) The determination of voluntariness is to be made initially by the trial court after reviewing the evidence, observing the witnesses and determining their credibility (*People v. Alvarez* (1981), 93 Ill. App. 3d 111, 416 N.E.2d 1217), and its decision will not be disturbed on review unless it is contrary to the manifest weight of the evidence (*In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672), including that which is adduced at trial (*People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121).

■ While we have no way of knowing whether the nature and extent of the evidence presented upon retrial will be the same as that introduced at the hearings on defendant's and Andrew's motions to suppress, which has been set out in some detail earlier, on the basis thereof, we cannot say that the trial court's finding that defendant's statement was voluntarily made was contrary to the manifest weight of the evidence.

Defendant's allegations of physical abuse were denied by all of the State's witnesses, which included not only the police officers he said had threatened and beat him, but also the assistant State's Attorney to whom he made an oral statement within one-half hour after his arrival at Area 2 and a written statement about one hour later, as well as the court reporter who transcribed it and took a photograph of defendant after it was made. Parenthetically, we note that while the photograph was not included in the record on appeal, there is nothing to indicate that it disclosed evidence of physical abuse. In addition, the testimony presented establishes that defendant was not deprived of food, nor was he continuously handcuffed while in custody, and despite his claims that he was not advised of his rights, he later admitted that he knew what they were. Even if he had not, however, the evidence in the record concerning his extensive criminal background and 12th grade education would support such a conclusion.

As to his charges of mental coercion, we note that while the trial

court noted and the State conceded that Andrew incurred various injuries while in custody, it appears that they were not inflicted until sometime after defendant's statements were given. The testimony of the State's witnesses, including those mentioned above, indicates that defendant agreed to answer questions about the shootings almost immediately after his arrival at the police station; and that he made no complaints nor expressed any fears to the assistant State's Attorney during their first conversation at 10:30 a.m. or when he gave his written statement less than 1½ hours later, after lunch. This evidence would thus refute his claim that he made the statement only because he heard his brother being beaten and feared that he would be subjected to the same treatment if he did not cooperate. Moreover, although defendant claims that he next saw his brother at the criminal courts building the following day, the record discloses that they appeared together in a lineup at about 4:30 p.m. that afternoon—several hours after defendant's statements—and that except for a cut above his eye, Andrew did not appear injured. In conclusion, we restate our belief the evidence was sufficient to support the trial court's finding that defendant's statement was voluntarily made and, therefore, admissible.

■ Defendant maintains, also, that the State failed to prove him legally accountable beyond a reasonable doubt for his brother's crimes, the essence of his argument being that he did nothing to aid or abet Andrew in the shooting or armed robbery of Officer Fahey. He argues that his statement that Officer O'Brien was "still there; he's up and about" was merely a "frightened observation" in response to Andrew's order to pick up the guns made while he was in a state of shock over the "terrifying nightmare" that had just occurred, and was insufficient to establish any intent to promote or facilitate the murder or armed robbery of Officer O'Brien.

By statute, one is legally accountable for the acts of another when:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c).

While it is true that mere presence at the scene of an offense or mere acquiescence in another's actions without proof of assistance by the person to be held accountable prior to or during commission of the offense ordinarily is insufficient to establish legal accountability (*People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150, *cert. de-*

*nied* (1981), 450 U.S. 1032, 68 L. Ed. 2d 228, 101 S. Ct. 1745), active participation has never been necessary to impose criminal guilt on that theory (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148). Defendant's presence at the scene without disapproving or opposing commission of the crime may be considered by the fact finder, together with all other relevant circumstances (*People v. Young* (1983), 116 Ill. App. 3d 984, 452 N.E.2d 718), including his conduct after its occurrence—since once a person becomes accountable he remains so until he detaches himself from the criminal enterprise (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148)—in determining whether the accused assisted in or assented to it (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 415 N.E.2d 502). The State's burden of proving specific intent to promote or facilitate commission of the crime is met where it shows that defendant shared the criminal intent of the principal or that there was a community of unlawful purpose (*People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150), and evidence that a defendant voluntarily attached himself to a person or group bent on illegal acts which are dangerous or homicidal in nature or which will probably or necessarily require the use of force and violence with knowledge of the person or group's design supports an inference of such common purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148; *People v. Feagans* (1985), 134 Ill. App. 3d 252, 480 N.E.2d 153).

■ In the instant case, the testimony of Derrick Martin and defendant's own statement established that only a few hours before these shootings, Andrew had devised a plan to help his friend, Edgar Hope, escape from custody, which included obtaining white uniforms and guns and posing as doctors, to enter the hospital where Hope was being held. It appears that defendant not only assented to, but aided in the furtherance of that plan—which was inherently violent in nature and surely could have resulted in multiple injuries and/or deaths at the hospital—by committing a burglary for the purpose of securing the weapons needed to accomplish it. Although he argues that evidence of other crimes is inadmissible to show a propensity to commit crime in general or that the prior crimes make it more likely that he committed the one in question, we note that such evidence is admissible if relevant to prove motive, knowledge, absence of an innocent frame of mind or the presence of a criminal intent, or that the crime in question was part of a common design, scheme or plan (see generally *People v. Kimbrough* (1985), 138 Ill. App. 3d 481). Here, we believe that evidence of the escape plan and the burglary committed

to facilitate it were relevant to any or all of the above factors and that the jurors might easily have inferred therefrom that the motivation for the shootings was (a) the recognition of an opportunity to acquire the officers' service revolvers—which were indeed taken from the scene—as weapons needed for the escape plan, (b) a determination to evade arrest—which, among other negative consequences, would have thwarted that plan, or (c) both.

■ As to the defendant's role in promoting or facilitating the actual commission of the offenses, it was reasonable for the jury to conclude that by telling Andrew that Officer O'Brien was "still there; he's up and about" when ordered by Andrew to get the guns, defendant was in fact advising Andrew that he could not do so because O'Brien was still alive, and thereby prompted Andrew to shoot O'Brien again—a total of four or five times—so that the guns could be obtained.

Finally, although it is unclear from the evidence presented whether it was defendant or Andrew who actually picked up the guns from beside O'Brien's body afterward, the fact remains, as noted above, that they were taken and placed in the car, that defendant then drove fast from the scene and thereafter went into hiding to elude apprehension by the police.

In summary, it is our view that the evidence presented at trial was sufficient to prove defendant legally accountable for the crimes committed beyond a reasonable doubt.

■ Defendant next posits that he was denied a fair trial because the qualification of prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, resulted in a conviction-prone jury which did not represent a fair cross-section of the community. The Illinois Supreme Court has repeatedly rejected this argument. (See *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307.) Despite such authority, defendant urges us to consider *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, *aff'd as modified* (8th Cir. 1985), 758 F. 2d 226, *cert. granted sub nom. Lockhart v. McCree* (1985), 474 U.S. ___, 88 L. Ed. 2d 48, 106 S. Ct. 59), and the empirical data cited therein. Although the *Grigsby* court did find that a Witherspooned jury was conviction-prone, the Illinois Supreme Court specifically referred to *Grigsby* when it rejected the same argument in *Caballero* and recently restated that position in *Collins* in reliance on *Wain-*

*wright v. Witt* (1985), 469 U.S. 810, 83 L. Ed. 2d 20, 105 S. Ct. 844, in which the United States Supreme Court clarified the standard for determining when a juror may be excused for cause and choosing a lesser standard than some lower courts have been applying. (See also *People v. Green* (1985), 136 Ill. App. 3d 361; *People v. Thomas* (1985), 139 Ill. App. 3d 163.) We do note that the United States Supreme Court recently granted a writ of *certiorari* in *Grisby* (see *Lockhart v. McCree* (1985), 474 U.S. ___, 88 L. Ed. 2d 48, 106 S. Ct. 59), but until that court holds otherwise, we must follow *Caballero* and *Collins*.

■ Defendant also argues that the State's use of its peremptory challenges to exclude blacks from the jury deprived him of his sixth amendment right to an impartial and representative jury. The Illinois Supreme Court has consistently held that under *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, the use of peremptory challenges to exclude minority jurors is permissible absent a demonstration by defendant that the practice is following systematically in a number of cases. (*People v. Gaines* (1984), 105 Ill. 2d 79, 473 N.E.2d 868, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 282, 105 S. Ct. 2666; *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, *cert. granted* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447.) Finding no such showing by defendant in the present case, we are bound by the decisions cited and find no further discussion of this issue necessary.

■ Finally, defendant posits that his mandatory natural life sentence, imposed pursuant to section 5—8—1(a)(1)(c) (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)), is unconstitutional because it: violates the separation of powers clause; prohibits consideration of rehabilitative potential; constitutes cruel and unusual punishment; and violates due process. In *People v. Taylor* (1984), 102 Ill. 2d 101, 464 N.E.2d 1059, the Illinois Supreme Court held that a mandatory natural life sentence does not violate the separation of powers clause nor does it prohibit consideration of rehabilitative potential. In *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154, the court addressed arguments similar to defendant's due process and cruel and unusual punishment assertions. In holding that mandatory life sentences were not unconstitutional on these bases, the court distinguished the only authority relied upon by defendant in the present case, *Salem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001, which did not involve a crime of substantial violence. Here, defendant was sentenced for two murder convictions and, in the light of *Taylor* and *Boswell*, we find his argument regarding the constitutionality of the mandatory natural life sentence statute to be without merit.

744

For the reasons stated, defendants convictions are reversed and his sentences vacated and this cause is remanded for a new trial.

Reversed and remanded.

LORENZ and MEJDA*, JJ., concur.

---

*This opinion was adopted as the opinion of the court prior to the retirement of Mr. Justice Mejda.